### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CHARLES BRENNAN,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 18-1417 |
| | : | |
| **CITY OF PHILADELPHIA, et al.,** | : | |
| | : | |
| Defendants. | : | |

## ORDER

**AND NOW**, this _____ day of _____, 2019, upon consideration of Defendants City of Philadelphia, James Kenney, Jane Slusser, and Christine Derenick-Lopez's Motion for Summary Judgment, and any response thereto, it is hereby **ORDERED** that the Motion is **GRANTED**.  Judgment is entered in favor of Defendants City of Philadelphia, James Kenney, Jane Slusser, and Christine Derenick-Lopez and against Plaintiff on all claims.

**BY THE COURT:**

_____
**JAN E. DUBOIS,** S.J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHARLES BRENNAN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 18-1417 |
| | : | |
| CITY OF PHILADELPHIA, et al., | : | |
| | : | |
| Defendants. | : | |

**DEFENDANTS CITY OF PHILADELPHIA, JAMES KENNEY, JANE SLUSSER, AND CHRISTINE DERENICK-LOPEZ'S MOTION FOR SUMMARY JUDGMENT**

Defendants City of Philadelphia, James Kenney, Jane Slusser, and Christine Derenick-Lopez file this Motion for Summary Judgment under Fed. R. Civ. Pro. 56, respectfully seeking that this Court enter judgment in their favor on all claims on the grounds more fully described in the supporting memorandum of law, attached pursuant to Local Rule 7.1(c).

Respectfully Submitted,

CITY OF PHILADELPHIA
LAW DEPARTMENT

Date: <u>October 11, 2019</u>        BY:    <u>s/ Christopher H. Rider</u>
Christopher H. Rider
Divisional Deputy City Solicitor
Pa. Attorney ID No. 307265
City of Philadelphia Law Dept.
1515 Arch St., 16th Fl.
Philadelphia, PA 19102
(215) 683-5082
christopher.rider@phila.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHARLES BRENNAN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 18-1417 |
| | : | |
| CITY OF PHILADELPHIA, et al., | : | |
| | : | |
| Defendants. | : | |

## DEFENDANTS CITY OF PHILADELPHIA, JAMES KENNEY, JANE SLUSSER, AND CHRISTINE DERENICK-LOPEZ'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

Plaintiff Charles Brennan, the City of Philadelphia's former Chief Information Officer, alleges that he was terminated in retaliation for speaking on several different matters.  According to Mr. Brennan, as a result, his termination violated 42 U.S.C. § 1981, Title VII, the PHRA, the PFPO, and the Pennsylvania Whistleblower Law (PWL).  Defendants are entitled to summary judgment on those claims on several grounds.

First, Mr. Brennan's 42 U.S.C. § 1981, Title VII, PHRA, PFPO, and PWL retaliation claims fail because he has not produced evidence to rebut Defendants' legitimate nonretaliatory reason for terminating his employment—that Mr. Brennan refused to attend training to improve his communication skills.

Additionally, those claims fail because Mr. Brennan has not produced evidence that his termination was causally connected to any protected activity.

Second, Mr. Brennan's First Amendment retaliation claims fail because it was well within the expansive scope of Mr. Brennan's CIO duties to report being asked to engage in misconduct, or register his complaints over what he viewed as wrongdoing or waste, within his chain of command. Accordingly, Mr. Brennan was speaking within the scope of his duties—not as a private citizen—when he opposed Mr. Atkinson's methods for implementing the City's diversity initiative, the City's methods in procuring body-worn cameras, or the City's directives related to the Comcast franchise agreement breach negotiations and, therefore, his speech was not protected.

Third, Mr. Brennan has not produced evidence that the allegedly-discriminatory practices he opposed—Nolan Atkinson's discussion and implementation of the City's diversity initiative and allegedly retaliatory actions taken against Mr. Brennan—actually violated 42 U.S.C. § 1981. Simply put, evidence that the City has aggressive diversity goals, and bluntly communicated those goals, is not evidence that the City intended for its supervisors to meet those goals by illegally terminating or refusing to hire anyone based on race, or that any City hiring manager preferentially hired minorities. While Mr. Atkinson's alleged remarks about the lack of diversity in Mr. Brennan's Department might have been insensitive, Mr. Atkinson made no suggestion that Mr. Brennan must take any

action other than the legal actions recommended by the City's diversity initiative, and Mr. Brennan concedes that he never hired employees based on race.

Fourth, Mr. Brennan's Pennsylvania Whistleblower Law (PWL), Act of Dec. 12, 1986, No. 169, P.L. 1559, 43 P.S. § 1421, *et seq.* claims also fail.  Mr. Brennan's report that Mr. Atkinson's conduct was "offensive and discriminatory" was not protected under the PWL because Mr. Atkinson's conduct (and the City's actual hiring practices) did not objectively violate a law, statute, or code of conduct. Second, Mr. Brennan's report that the Police Department drafted an inappropriate bid solicitation was not actionable because the City never actually issued the bid. Third, Mr. Brennan's report that the City's use of a cooperative purchasing agreement to procure body-worn cameras constituted substantial waste (if Mr. Brennan even made such a report) was not protected activity because he has adduced no evidence that other comparably-sized cities have spent less than Philadelphia to procure equivalent camera systems.  Finally, Mr. Brennan's assertion to his supervisor that Comcast must be penalized <u>if</u> it breached a franchise agreement a second time was not a report of substantial waste because, at the time of his report, no such breach had occurred.  Finally, Mr. Brennan's PWL claims fail because he has failed to identify concrete evidence—as required by the PWL—linking his termination to any report of waste or wrongdoing, and because Defendants have proffered a separate and legitimate reason for his termination.

Therefore, this Court should grant summary judgment in favor of Defendants on Mr. Brennan's claims.

II.   **FACTUAL SUMMARY**

Defendants incorporate their Statement of Undisputed Material Facts.

III.   **SUMMARY JUDGMENT STANDARD**

The court shall render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. See id. All inferences must be drawn, and all doubts resolved in favor of the non-moving party. See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985).

On motion for summary judgment, the moving party bears the initial burden of identifying these portions of the record that it believes demonstrate the absence of material fact disputes. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the moving party, and may not rest on mere denials. See id. at 321, n.3; First Natl. Bank of Pa. v. Lincoln Natl. Life Ins. Co., 824 F.2d 277, 282 (3d Cir. 1987).

4

The nonmoving party may not resist a properly filed motion for summary judgment by relying solely on the unsupported conclusory allegations contained in pleadings, but rather must go beyond the pleadings and affidavits and designate specific facts showing that there is a genuine issue for trial. Anderson, 477 U.S. at 248. "[A] party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements." Super Fresh Food Mkts., Inc. v. United Food & Commercial Workers Local Union 1776, 249 F. Supp. 2d 546, 551 (E.D. Pa. 2003). In ruling on a defendant's motion for summary judgment, a mere scintilla of evidence in support of the plaintiff's position is insufficient. Anderson, 477 U.S. at 252. Enough evidence must exist such that a jury could reasonably find for the plaintiff. Id. The plaintiff cannot merely rely upon assertions or speculation. Gans, 762 F.2d at 341. If the evidence is merely colorable or is not sufficiently probative, summary judgment may be granted. Bouriez v. Carnegie Mellon Univ., 585 F.3d 765, 771 (3d Cir. 2009). Additionally, "the unverified representations of counsel in a brief are not a proper part of the record for consideration on a motion for summary judgment." Prince v. Sun Shipbuilding & Dry Dock Corp., 86 F.R.D. 106, 107 (E.D. Pa. 1980). Where a non-moving party bears the burden of proof at trial, the moving party's burden may be "'discharged by 'showing'...that there is an absence of evidence to support the nonmoving party's case.'" Bouriez, 585 F.3d at 771 (quoting Celotex, 477 U.S. at 325). If the moving party carries this burden, "the burden shifts to the non-moving party to point to sufficient cognizable evidence to create material issues of

fact such that a reasonable jury could find in its favor."  Bouriez, 585 F.3d at 771 (internal citation and quotation marks omitted).

## IV.   LEGAL ARGUMENT

### A.  PLAINTIFF'S SECTION 1981, TITLE VII, PHRA, AND PFPO RETALIATION CLAIMS FAIL AS A MATTER OF LAW.

Mr. Brennan has alleged that Defendants' decision to terminate his employment with the City of Philadelphia violated anti-retaliation provisions of 42 U.S.C. § 1981, Title VII, the PHRA, and the PFPO.  These claims, which are analyzed identically,[1] fail for two reasons.  First, Defendants have provided a legitimate non-retaliatory reason for terminating Mr. Brennan's employment—his admitted failure to willingly address communication shortcomings through supplemental training.  Mr. Brennan has not produced evidence from which a reasonable factfinder could conclude that Defendants' legitimate non-retaliatory reason was pretextual.  Second, Mr. Brennan has failed to provide evidence that his protected activity was causally connected to his termination, as Mr. Brennan was terminated at more than a month after his last protected activity.  Therefore, this Court should grant summary judgment in Defendants' favor on Mr. Brennan's retaliation-based claims.

---

[1] See Estate of Oliva, 604 F.3d at 798 (citing to Moore for the standard in a 42 U.S.C. § 1981 retaliation claim); Moore, 461 F.3d at 340-41 (Title VII retaliation standard); Weston, 251 F.3d at 426 (Title VII and PHRA claims are analyzed identically); Darby, 216 F. Supp. 3d at 543 ("PFPO claims are generally evaluated under the same legal framework as Title VII claims.")

     i.  **Mr. Brennan's Retaliation Claims Fail Because Defendants Have Produced Evidence of Legitimate Non-Retaliatory Reasons for His Termination, and Mr. Brennan Has Not Offered Evidence That Those Reasons Were Pretextual.**

As a matter of convenience, Defendants first address whether, even if this Court were to find that Mr. Brennan could establish a *prima facie* retaliation claim, he has produced any evidence from which a reasonable jury could conclude that the reason given for his termination—his admitted failure to willingly address perceived shortcomings by attending sensitivity training—was either not the real reason for his termination, or that the real reason for his termination was retaliation.

If a plaintiff establishes a *prima facie* case of retaliation, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct." Carvalho-Grevious v. Delaware State Univ., 851 F.3d 249, 257 (3d Cir. 2017) (quotes omitted); Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999) (applying Title VII's burden shifting framework to Section 1981 claims).  If the employer does so, the burden shifts back to the plaintiff "to convince the fact finder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." Id.  "To survive summary judgment on the issue of pretext, a plaintiff must produce evidence from which a reasonable jury could conclude that the employer's proffered explanation is false and that retaliation was the real reason for the adverse employment action." Steele v. Pelmor Laboratories, Inc., 725 Fed. Appx. 176, 179 (3d Cir. 2018).  "'[A]n inference [of pretext] based upon a speculation or conjecture does not create a

material factual dispute sufficient to defeat [entry of] summary judgment.'" Id.

(quoting Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014)).  "The plaintiff's

evidence, if it relates to the credibility of the employer's proffered justification,

'must demonstrate such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for

its action that a reasonable factfinder could rationally find them unworthy of

credence.'" Burton v. Teleflex Inc., 707 F.3d 417, 427 (3d Cir. 2013) (quoting

Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).  Ultimately, the question is not

"whether the employer made the best, or even a sound, business decision; it is

whether the real reason is [discrimination]." Keller v. Orix Credit Alliance, Inc.,

130 F.3d 1101, 1109 (3d Cir. 1997).

Defendants terminated Mr. Brennan because he was unwilling to address

Defendants' concerns with his communication style by attending sensitivity

training.  Statement of Undisputed Material Facts (UMF)  ¶¶ 92-93.  Although Mr.

Brennan disagreed with Defendants' assessment of his communication skills, his

disagreement is immaterial.  See Smith v. RC Operator, LLC, No. 15-3055, 2018

WL 2261054, at *6 (E.D. Pa. Jul. 9, 2018) ("The fact that plaintiff disagrees with

defendant's evaluation of her does not prove pretext.")  Moreover, regardless of

whether Mr. Brennan agrees that his communication skills needed improvement,

the following facts are undisputed: numerous individuals, including his former

supervisor, Rebecca Rhynhart, his former COO, James White, the City's Commerce

Director, Harold Epps, Jeannette Bruno, and Dawn Somerville have either

8

characterized him as abrasive, not politically correct, and insensitive in communicating with third parties.  Id. ¶¶ 65, 66, 68, 69, 71, 81.  As a result of his communication style, Mr. Brennan was no longer permitted to accompany the Commerce Department on business attraction and retention trips.  Id. ¶ 74.  These observations give credence to Defendants' basis for requesting Mr. Brennan attend training to improve his communication skills, and ultimately rebut Mr. Brennan's assertion that his failure to address those concerns was not the real reason for his termination.

Additionally, it is of no moment that Mr. Brennan was not ordered to attend training.  As CIO, Mr. Brennan was no longer serving the City as a rank-and-file police officer, but rather as a high-level senior leader—Defendants could reasonably expect him to respond to requests, rather than require orders, to participate in his own development.  Moreover, Defendants merely asked Mr. Brennan to attend sensitivity training so that he might learn to communicate more effectively; it was not intended to be a punishment but, rather, a tool to enhance essential skills.  Id. ¶ 87.  Even though Mr. Brennan was not being punished by being asked to attend sensitivity training, he refused to go willingly.  Id. ¶¶ 86, 87.  It was this intransigence, this willful blindness to self-improvement from a senior leader of the City, that led Ms. Derenick-Lopez to the realization that she needed to replace Mr. Brennan as CIO.  Id. ¶¶ 92-93.

Defendants have no doubt that Mr. Brennan intends to argue that his punishment simply did not fit the crime; recalcitrance in attending sensitivity

training did not, in his eyes, merit termination.  However, Mr. Brennan may misconstrue the relevant caselaw in making this argument.  In <u>Kilpatrick</u>, even though an arbitrator had found the plaintiff's termination unwarranted under the circumstances, the Third Circuit held that the excessive discipline was insufficient to infer that the reason for the penalty was retaliation, stating that "[t]he excessiveness of the action taken…does not bolster the position that the likely reason for it was retaliation."  <u>Kilpatrick v. Sec'y., U.S. Dept. of Veterans Affairs</u>, 754 Fed. Appx. 123, 127 (3d Cir. 2018).

The same is true here.  Although Mr. Brennan may believe that termination was not the appropriate penalty for his actions, no reasonable factfinder could conclude that his intransigence did not warrant some manner of rebuke, particularly given his level of responsibility in the organization.  Whether termination was the appropriate penalty weighs against whether Defendants made a sensible decision, not whether their decision was unworthy of credence.

Therefore, because Defendants have advanced a legitimate, nonretaliatory reason for Mr. Brennan's termination, and Mr. Brennan cannot produce evidence from which a reasonable factfinder could conclude that Defendants' reason was either not their real reason, or that their real reason for terminating Mr. Brennan's employment with the City was retaliation, this Court should enter summary judgment in Defendants' favor on Mr. Brennan's 42 U.S.C. § 1981, Title VII, PHRA, and PFPO claims.

ii.  **Mr. Brennan's Retaliation Claims Fail Because He Has Produced No Evidence of a Causal Connection Between His Protected Activity and Any Materially Adverse Action.**

Moreover, Mr. Brennan has failed to even establish a *prima facie* retaliation claim, as he has not provided evidence of a causal connection between any protected activity and a materially-adverse action.  Mr. Brennan has alleged two instances of protected activity.  First, he informed Ms. Derenick-Lopez that he felt that Mr. Atkinson's comments—that OIT's white numbers were moving in the wrong direction and that OIT had too many Asians—were "offensive and discriminatory" approximately a week after the meeting in which those comments occurred.  UMF ¶ 28.  Second, he raised the same concerns when Ms. Derenick-Lopez discussed his attending sensitivity training in early December 2017.  Id. ¶¶ 29, 86.  Ms. Derenick-Lopez terminated Mr. Brennan's employment with the City on January 12, 2018. Id. ¶ 101.  A months' gap between his last comment and his termination is insufficient for Mr. Brennan to prove a *prima facie* causal connection between protected activity and retaliatory action, since he has not identified any intervening pattern of antagonism.  Accordingly, this Court should grant summary judgment in Defendants' favor on Mr. Brennan's retaliation claims.

"Title VII retaliation claims must be proved according to traditional principles of but-for causation…[t]his requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  Univ. of Texas Southwestern Medical Center v. Nassar, 570 U.S. 338, 360 (2013).  Courts tend to focus on two factors in assessing whether a plaintiff

has shown causation: "(1) the temporal proximity between the protected activity and the alleged discrimination and (2) the existence of a pattern of antagonism in the intervening period." Hussein v. UPMC Mercy Hosp., 466 Fed. Appx. 108, 112 (3d Cir. 2012) (quotes omitted). Without more, "a gap of three months between the protected activity and the adverse action…cannot create an inference of causation and defeat summary judgment." LeBoon v. Lancaster Jewish Community Center Ass'n, 503 F.3d 217, 233 (3d Cir. 2007); see also Blakney v. City of Phila., 559 Fed. Appx. 183, 186 (3d Cir. 2014) ("We have found that a temporal proximity of two days is unusually suggestive of causation, but have held that a temporal proximity greater than ten days requires supplementary evidence of retaliatory motive."); Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003) (finding temporal proximity not unduly suggestive where three weeks elapsed between protected activity and adverse employment action); Kier v. F. Lackland & Sons, LLC, 72 F. Supp. 3d 597 (E.D. Pa. 2014) ("Absent some intervening antagonism, Plaintiff cannot rest solely on a temporal proximity of more than one week."); Abdul-Latif v. Cnty. of Lancaster, 990 F. Supp. 2d 517, 531 (E.D. Pa. 2014) ("Six days is at the long end of what has been held to be unusually suggestive....").

Mr. Brennan's first alleged protected activity occurred approximately a week after his early 2017 meeting with Nolan Atkinson in which Mr. Atkinson allegedly told Mr. Brennan that the "white numbers" for his department were "moving in the wrong direction," and that Mr. Brennan's department had "too many Asians." UMF ¶ 28. Ms. Derenick-Lopez did not terminate Mr. Brennan's employment until

January 12, 2018.  Id. ¶ 101.  Mr. Brennan testified that the meeting in question was the first of four quarterly meetings in 2017 but was unable to testify as to the exact date of the meeting.  Id. ¶ 24.  Assuming, generously, that the meeting occurred no later than May 2, 2017, and Mr. Brennan registered his complaints with Ms. Derenick-Lopez no later than May 15, 2017, 242 days elapsed between any protected activity and the allegedly retaliatory action.  More than two hundred days, standing alone, is not "unduly suggestive" of retaliatory motive.  Moreover, although Mr. Brennan has alleged that his relationship with Ms. Derenick-Lopez grew frosty later in his tenure, as meetings with her became caustic and she began to disregard his advice, he has traced that breakdown to his opposition to the body-worn cameras RFP, not to his opposition to the diversity initiative.  Id. ¶¶ 53, 55.  Additionally, Mr. Brennan testified that he considered Ms. Derenick-Lopez "a bully" and that it was "her way or the highway" long before he engaged in protected activity, id. ¶ 10, robbing any force from his argument that his fraught interactions with her were related to protected activity.  Accordingly, he has failed to produce evidence of either temporal proximity or an intervening pattern of antagonism (related to his protected activity) between his protected activity and his termination.

Mr. Brennan's second instance of alleged protected activity occurred during the first week in December 2017.  UMF ¶¶ 29, 86.  Assuming that it occurred no later than December 7, 2017, more than thirty days elapsed between his protected activity and his January 12, 2018 termination.  Although thirty days is temporally

closer than 165 or 242 days, it is still insufficient, standing alone, to prove causation.  See Blakney, 183 F.3d at 186 ("We have found that a temporal proximity of two days is unusually suggestive of causation, but have held that a temporal proximity greater than ten days requires supplementary evidence of retaliatory motive.")

Nor has Mr. Brennan produced the supplementary evidence of motive necessary to prove causation in the absence of true temporal proximity.  Mr. Brennan cannot point to an intervening pattern of antagonism between the protected activity and the retaliation; he thought his relationship with Ms. Derenick-Lopez improved during this period, aside from one argument about whether her deputy was giving appropriate advice.  UMF ¶¶ 89-90.  Additionally, the fact that he repeatedly complained that Mr. Atkinson's comments were offensive and discriminatory without Defendants taking any retaliatory actions weighs heavily against an inference of causation.  Finally, the record evidence demonstrates that other senior City leadership complained about what they perceived as Mr. Atkinson applying undue pressure to improve their respective department diversity numbers, without any evidence of retaliatory actions taken against them.  Id. ¶¶ 30-31.

In short, Mr. Brennan has offered no evidence that his comments caused his termination.  Because he has not, therefore, established a *prima facie* case of retaliation, this Court should enter summary judgment in Defendants' favor on Mr. Brennan's retaliation claims.

14

**B. PLAINTIFF'S FIRST AMENDMENT RETALIATION CLAIMS FAIL BECAUSE HE WAS NOT SPEAKING AS A PRIVATE CITIZEN WHEN HE PROTESTED THROUGH HIS CHAIN OF COMMAND THE DECISIONS WHICH DIRECTLY IMPACTED HIS WORK RESPONSIBILITIES.**

Mr. Brennan has alleged that Defendants terminated him because: (1) he opposed the manner in which Nolan Atkinson implemented the City's diversity initiative; (2) complained about the manner in which the City attempted to procure body-worn cameras; and (3) complained about being asked to "take it easy" on Comcast during negotiations over the franchise agreement between the City and Comcast. According to Mr. Brennan, these complaints were protected by the First Amendment and, thus, Defendants violated the First Amendment when they terminated him. These claims fail, as Mr. Brennan was not acting as a private citizen when he complained about these issues because he merely protested through his chain of command regarding issues with which he was intimately involved as part of his ordinary job duties. Therefore, this Court should grant summary judgment in Defendants' favor on Mr. Brennan's First Amendment retaliation claims.

To establish a First Amendment retaliation claim against her employer, a public employee must establish two elements: "(1) the activity in question is protected by the First Amendment; and (2) the protected activity was a substantial factor in the alleged retaliatory action." Falco v. Zimmer, 767 Fed. Appx. 288, 298 (3d Cir. 2019) (citing Hill v. Borough of Kutztown, 455 F.3d 225, 241 (3d Cir. 2006).

"As a general rule, a public employee's speech is protected by the First Amendment 'when (1) in making it, the employee spoke as a citizen[;] (2) the statement involved a matter of public concern[;] and (3) the government employer did not have an adequate justification for treating the employee differently from any other member of the general public as a result of the statement he made.'" Falco, 767 Fed. Appx. at 300 (quoting Hill, 455 F.3d at 241-42). "A public employee does not speak 'as [a] citizen[ ]' when he makes a statement 'pursuant to [his] official duties.'" Id. (quoting Garcetti v. Ceballos, 547 U.S. 410, 421 (2006)) (alterations in original). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Id. (quoting Rankin v. McPherson, 483 U.S. 378, 384–85 (1987)).

In determining whether an employee's speech was made pursuant to his official duties, courts should consider: "[1] whether the employee's speech relates to 'special knowledge' or 'experience' acquired through his job[;]…[2] whether the employee raises complaints or concerns about issues relating to his job duties 'up the chain of command' at his workplace[;]…[3] whether the speech fell within the employee's designated responsibilities[;]…and…[4] whether the employee's speech is in furtherance of his designated duties, even if the speech at issue is not part of them." Kimmett v. Corbett, 554 Fed. Appx. 106, 111 (3d Cir. 2014). However, the controlling factor in whether a public employee is speaking pursuant to his official duties is "whether such utterances are among the things that the employee 'was

16

employed to do.'" <u>Falco</u>, 767 Fed. Appx. at 301 (quoting <u>Garcetti</u>, 547 U.S. at 421).

In short, "if a public employee's speech is part of his ordinary job duties, the

employee is acting as a public employee and his activity is thus not protected under

the First Amendment." <u>Id.</u> at 302.

     The Third Circuit has repeatedly held that reports of misconduct, made

through an employee's chain of command, are within an employee's official duties.

<u>See</u> <u>Foraker v. Chaffinch</u>, 501 F.3d 231, 240 (3d Cir. 2007) ("[plaintiffs] were acting

within their job duties when they expressed their concerns up the chain of

command...."); <u>Hill</u>, 455 F.3d at 242 (3d Cir. 2006) (a town borough manager's

reports to his superiors about harassment by the town mayor were not protected

speech); <u>Morris v. Phila. Housing Auth.</u>, 487 Fed. Appx. 37, 40 (3d Cir. 2012)

(complaints to direct supervisors about misconduct were within an employee's job

duties); <u>Skrutski v. Marut</u>, 288 Fed. Appx. 803, 807 (3d Cir. 2008) (police sergeant's

reports of misconduct, made within a chain of command, were not protected speech).

<u>Bradley v. W. Chester Univ. of Pa. State Sys. of Higher Educ.</u>, 880 F.3d 643, 653 (3d

Cir. 2018) (budget director's complaints of fraud, made during an internal meeting,

were not protected speech).

> ### i. Mr. Brennan's Complaints About Nolan Atkinson's Conduct Were Not Protected Conduct Because Atkinson Met with Mr. Brennan Pursuant to Mr. Brennan's Job Responsibilities, and Mr. Brennan Reported Being Asked to Implement Ostensibly Inappropriate Directives to His Supervisor.

     Mr. Atkinson met with Mr. Brennan because Mr. Brennan was the ultimate

hiring authority for OIT. <u>Id.</u> ¶¶ 19, 22.  It was during one of those meetings that

Mr. Atkinson allegedly told Mr. Brennan that the "white numbers" for his department were "moving in the wrong direction," and that Mr. Brennan's department had "too many Asians." Id. ¶ 24. These comments, combined with Mr. Brennan's feeling that Mr. Atkinson was pressuring him to hire minorities, caused Mr. Brennan to raise his concerns with his supervisor, Christine Derenick-Lopez. Id. ¶¶ 26-28. These concerns were directly related to Mr. Brennan's job duties because, as the ultimate hiring authority for OIT, he believed he was being asked to implement inappropriate directives.

Here, Mr. Brennan cannot plausible argue that his job duties did not include informing his superiors of potential misconduct related to the performance of those duties. He was no longer a rank-and-file city employee for whom complaining about misconduct was beyond his pay grade; as CIO, Mr. Brennan enjoyed significant authority and discretion, as he was charged with running an agency that implemented millions of dollars in capital projects. Id. ¶¶ 4-6. Reporting that he felt that he was being asked to implement inappropriate directives was well within Mr. Brennan's expansive job duties.

Additionally, the fact that Mr. Brennan reported his concerns through his chain of command to his direct supervisor weighs heavily in favor of Defendants' argument that his reports of misconduct were within his job duties. Id. ¶ 28; see Hill, 455 F.3d at 242 (a town borough manager's reports to his superiors about harassment by the town mayor were not protected speech); Morris, 487 Fed. Appx. at 40 (complaints to direct supervisors about misconduct were within an employee's

job duties); <u>Skrutski</u>, 288 Fed. Appx. at 807 (police sergeant's reports of misconduct, made within a chain of command, were not protected speech).  Accordingly, Mr. Brennan was not acting as a private citizen in raising his concerns with the way Nolan Atkinson was implementing the City's diversity initiative, and, therefore, his complaints were not protected activity.

### ii.  Mr. Brennan's Complaints About Using an RFP to Procure Body-Worn Cameras Were Not Protected Conduct Because OIT Was Required to Approve That RFP, and Mr. Brennan Registered Those Complaints Within His Chain of Command.

Mr. Brennan was, again, not acting as a private citizen when he opposed issuance of the police body-worn cameras RFP at the May 2017 meeting regarding procuring those cameras,[2] as attending that meeting and offering his views on the merits of various procurement vehicles for purchasing body-worn cameras was within the ordinary scope of his job duties.

First, Mr. Brennan attended the meeting in question because he led the organization responsible for approving procurement methods for purchasing hardware, software, and cloud-based electronic file storage (as was required for body-worn cameras.)  UMF ¶¶ 41-42.  He was, therefore, at that meeting only as an ordinary corollary to his position as CIO.  Second, Mr. Brennan offered his opinion during this meeting on the RFP in question because it was his ultimately job to approve or disapprove that RFP; his speech flowed directly from his job duties as

---

[2] To the extent Mr. Brennan intends to claim that James White's original report to Ellen Kaplan, the City's integrity officer, UMF ¶ 44, was his protected activity, that claim fails. <u>See Falco</u>, 767 Fed. Appx. at 307 ("one cannot claim First Amendment protection for the speech of another.")

CIO.  See Bradley, 880 F.3d at 652-53 (budget officer's reports of financial misconduct, made during an internal meeting, were not protected activity).  Finally, Mr. Brennan made his comments to his direct supervisor, and other senior City leadership, i.e. within his chain of command.  UMF ¶¶ 46-47.  Accordingly, his speech was not protected by the First Amendment.

        iii.  **Mr. Brennan's Complaints About Being Asked to "Take It Easy" on Comcast During Negotiations over Comcast's Potential Breach of the Franchise Agreement Were Not Protected Activity as They Were Made Pursuant to His Official Duties and Through His Chain of Command.**

As CIO, Mr. Brennan was responsible for overseeing the cable franchise agreement between Comcast and the City of Philadelphia, including negotiations over any breach of that agreement.  UMF ¶¶ 56.  His discussion with Ms. Derenick-Lopez about whether he should "take it easy" on Comcast occurred because of his position leading those negotiations (is it was Mr. Brennan's ultimate decision to impose any penalties for a breach), and any complaints he made during that discussion were within his chain of command.  Id. ¶¶ 60-62.  Accordingly, Mr. Brennan was not acting as a private citizen when he discussed this issue with Ms. Derenick-Lopez and registered his opposition to failing to penalize Comcast for any further breaches of the agreement.

Therefore, Mr. Brennan was, at all relevant times, discharging his job duties when he discussed within the confines of his organization: (1) his opposition to certain hiring practices he was being asked to implement; (2) his opposition to using an inappropriate RFP to procure body-worn cameras (which he had to approve); and

(3) his opposition to failing to penalize Comcast for further breaches of the franchise agreement, which he was negotiating. Accordingly, his complaints regarding those subjects were not protected by the First Amendment, and, therefore, this Court should grant summary judgment in Defendants' favor on those claims.

### C. All OF MR. BRENNAN'S CLAIMS AGAINST MAYOR KENNEY FAIL BECAUSE HE CANNOT PROVE A CAUSAL CONNECTION BETWEEN HIS ALLEGEDLY PROTECTED ACTIVITY AND ANY ACTION BY MAYOR KENNEY WITHOUT EVIDENCE MAYOR KENNEY WAS AWARE THAT PLAINTIFF COMPLAINED OF ANY DISCRIMINATORY PRACTICE, WASTE, OR WRONGDOING.

Mr. Brennan brought claims against Mayor James Kenney for retaliation in violation of 42 U.S.C. § 1981, the PHRA, the PFPO, and the PWL. These claims fail because Mayor Kenney was unaware that Mr. Brennan had opposed any discriminatory practices or opposed instances of waste or wrongdoing and, accordingly, was incapable of retaliating against Mr. Brennan when he approved Mr. Brennan's termination. Therefore, this Court should enter summary judgment in Mayor Kenney's favor on all claims.

Retaliation-based claims under 42 U.S.C. §§ 1981 or 1983, the PHRA, the PFPO, or the PWL require, essentially, that a plaintiff proffer evidence that: (1) he engaged in protected activity; (2) the employer or individual took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action. Estate of Oliva ex rel. McHugh v. New Jersey, 604 F.3d 788, 798 (3d Cir. 2010) (citing to Moore for the standard in a 42 U.S.C. § 1981 retaliation claim); Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006) (Title VII retaliation standard);

Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001) (Title VII and PHRA claims are analyzed identically); Darby v. Temple Univ., 216 F. Supp. 3d 535, 543 (E.D. Pa. 2016) ("PFPO claims are generally evaluated under the same legal framework as Title VII claims."); Thomas v. Independence Tp., 463 F.3d 285, 296 (3d Cir. 2006) (First Amendment retaliation standard); Golaschevsky v. Dep't of Envtl. Prot., 554 Pa. 157, 720 A.2d 757, 759–60 (1998) (holding that plaintiff employee must also present some evidence of a causal connection between his or her report and the alleged retaliation).

Proof of a causal connection naturally requires proof that the individual who took the adverse employment action (or directed others to take an adverse employment action) was aware of the protected activity. See Ambrose v. Township of Robinson, Pa., 303 F.3d 488, 493 (3d Cir. 2002) ("[F]or protected conduct to be a substantial or motivating factor in a decision, the decisionmakers must be aware of the protected conduct."); Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 196 (3d Cir. 2015) (a plaintiff "cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted.")

Mayor Kenney has testified under oath that he was unaware that Mr. Brennan had opposed: (1) the way Mr. Atkinson was implementing the City's diversity initiative; (2) the way the City procured the police body-worn cameras; or (3) refraining from further penalizing Comcast during franchise agreement breach negotiations.  UMF ¶¶ 98-100.  Mr. Brennan proffers little evidence to rebut Mayor

Kenney's testimony; at best, Mr. Brennan has asserted that the Mayor's Office (but not the mayor himself) directed him to "take it easy" on Comcast.  Id. ¶ 62.  Mr. Brennan simply has nothing beyond his own speculation that Defendants relayed his concerns about the diversity initiative, the body-worn cameras procurement process, or the franchise agreement negotiations to the mayor.  Without evidence that Mayor Kenney knew of his allegedly protected activity, Mr. Brennan cannot establish a causal connection between that activity and Mayor Kenney's actions in approving his termination.  Therefore, this Court should grant summary judgment in Mayor Kenney's favor on all claims.

### D. PLAINTIFF'S 42 U.S.C. § 1981 RETALIATION CLAIMS FAIL BECAUSE HE HAS NO EVIDENCE THAT HE OPPOSED ACTIONS THAT ACTUALLY VIOLATED 42 U.S.C. § 1981.

Mr. Brennan has alleged that Defendants violated 42 U.S.C. § 1981 by terminating his employment in retaliation for his protesting racially-discriminatory municipal hiring practices, and for protesting retaliatory actions taken against him. These claims fail because 42 U.S.C. § 1981 retaliation claims, unlike Title VII retaliation claims, require that a plaintiff protest an underlying action that actually violated § 1981.  Because Mr. Brennan cannot prove that either the municipal practice he opposed—the City's diversity initiative—or Mr. Atkinson's comments actually violated 42 U.S.C. § 1981, and has not alleged in his complaint that any other actions taken against him (aside from his termination) violated § 1981, his claims fail, and this Court should grant summary judgment for Defendants on those claims.

A 42 U.S.C. § 1981 retaliation claim, like a Title VII retaliation claim, requires that a plaintiff establish that " (1) he engaged in protected activity, (2) his employer took an adverse employment action against him, and (3) there was a causal connection between his participation in the protected activity and the adverse employment action."  Estate of Oliva ex rel. McHugh v. New Jersey, 604 F.3d 788, 798 (3d Cir.  2010).  However, unlike a Title VII retaliation claim, a § 1981 claim requires that the plaintiff demonstrate that he complained about actions which actually violated § 1981.  Id.; Ellis v. Budget Maintenance, Inc., 25 F. Supp. 3d 749, 754-55 (E.D. Pa. 2014); Collins v. Kimberly-Clark Penn., LLC, 247 F. Supp. 3d 571, 604–05 (E.D. Pa. 2017), aff'd, 708 Fed. Appx. 48 (3d Cir.  2017).

Mr. Brennan complained about the City's "racially discriminatory municipal practices in hiring and retention of employees" and about "retaliation against himself."  2nd Am. Compl. ¶ 81.  Mr. Brennan, however, has failed to produce any evidence that the City's practices in hiring and retention resulted in a minority candidate being chosen over a white candidate for discriminatory reasons.  See Smith, 2018 WL 2261054, at *3 (prima facie 42 U.S.C. § 1981 discrimination claim requires an adverse employment action).  Certainly, Mr. Brennan has admitted that he never hired a minority candidate less qualified than a white candidate, and that no City employee "put their thumb on the scale" for any minority candidate for employment with OIT under his leadership.  UMF ¶ 37. Rather, the record evidence is that the City's diversity initiative was intended to increase diversity by supplying diverse candidates and managing attrition rates of diverse employees.  Id. ¶ 18.

24

Although Nolan Atkinson's comments—that OIT's "white numbers" were "moving in the wrong direction" and that OIT had "too many Asians"—would, if true, have been ill-advised and potentially inappropriate, they did not, in and of themselves, violate § 1981.

Nor can Mr. Brennan rely on speaking out against his own retaliation to save his claim. See 2nd Am. Compl. ¶81. As a preliminary matter, Mr. Brennan has not alleged that any actions taken against him, other than his termination, violated 42 U.S.C. § 1981. 2nd Am. Compl. ¶¶ 79-83. Nor can he credibly argue that the other actions taken against him during his employment rise to the level of an adverse employment action. Accordingly, although he may have complained about being asked to attend sensitivity training, or that Ms. Derenick-Lopez used profanities during meetings, because those underlying actions did not violate § 1981, Mr. Brennan cannot use them as a basis for a § 1981 retaliation claim. Therefore, this Court should grant summary judgment in Defendants' favor on Mr. Brennan's 42 U.S.C. § 1981 claims.

### E.  PLAINTIFF'S PENNSYLVANIA WHISTLEBLOWER LAW CLAIMS FAIL AS A MATTER OF LAW.

Mr. Brennan has alleged that Defendants terminated him for opposing wrongdoing and/or waste in violation of the PWL, specifically for his opposition to: (1) the City's implementation of the diversity initiative (alleged wrongdoing); (2) the City's attempt to use an inappropriate RFP to procure body-worn cameras (alleged wrongdoing); (3) the City's failure to publicly-bid the body-worn cameras procurement contract (alleged waste and/or wrongdoing); (4) and the City's decision

to potentially refrain from penalizing Comcast for further franchise agreement breaches (alleged waste).  These claims fail because Mr. Brennan cannot produce evidence that: (1) certain actions he opposed actually violated any statutes or laws; (2) he opposed actual, rather than hypothetical, waste or wrongdoing; (3) there was a *prima facie* causal connection between his reports and his termination. Additionally, Mr. Brennan's PWL claims fail because Defendants have set forth a separate and legitimate reason for his termination.

The PWL prohibits employers from retaliating regarding an employee's compensation, terms, conditions, location or privileges of employment for engaging in certain protected activities in the workplace.  43 P.S. § 1423(a).  As a threshold matter, to establish a PWL claim, an employee must prove by a preponderance of the evidence that he engaged in protected activity prior to the alleged retaliation— that he "ma[de] a good faith report. . . to the employer or appropriate authority [of] an instance of wrongdoing or waste."  43 P.S. § 1423.

"Waste" and "wrongdoing" are narrowly defined by the statute.  See Drumm v. Triangle Tech, Inc., No. 15-854, 2016 WL 1384886, at *8 (M.D. Pa. Apr. 7, 2016) (stating Pennsylvania WBL "narrow[ly] defin[es] . . . 'waste' and 'wrongdoing'."); Sukenik v. Twp. of Elizabeth, 131 A.3d 550, 555 (Pa. Commw. 2016) (similar). "Wrongdoing" is defined as "[a] violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer."  43 P.S. § 1422.  Waste is defined as "[a]n

employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from…political subdivision sources." Id.

   i. **Mr. Brennan's PWL Claim Related to His Report That the City's Method of Implementing Its Diversity Initiative Violated the Law Fails Because No Law, Statute, or Code of Conduct Prohibited the Conduct He Reported and Any Such Violation Was Hypothetical or Potential.**

Mr. Brennan alleges that he was terminated, at least in part, for reporting that Nolan Atkinson's focus on racial metrics in increasing departmental diversity, combined with Mr. Atkinson's statements to Mr. Brennan that the "white numbers" for his department were "moving in the wrong direction" and that Mr. Brennan's department had "too many Asians," violated the law. This claim, made pursuant to the PWL, fails because the City's actual hiring practices and Mr. Atkinson's objectively do not violate any law, statute, or code of conduct.

A PWL report "must provide information that is sufficient to identify the law allegedly violated; reports of vague or subjectively wrong conduct are not considered wrongdoing under the Whistleblower Law." Sukenik, 131 A.3d at 555-56. "The law that the employer violated must specifically define some prohibited conduct or it cannot be violated in a way that constitutes a 'wrongdoing[;]'" a law or policy which is silent on whether such conduct is specifically prohibited is insufficient. Id. at 556; Evans, 81 A.3d at 1072.

As discussed earlier in this motion, Mr. Atkinson's focus on statistics in increasing racial diversity in City departments, without evidence of actual

discriminatory actions, does not violate 42 U.S.C. § 1981 (or other anti-discrimination laws, which bar the same conduct as § 1981).  Mr. Brennan interpreted Mr. Atkinson's urging to increase OIT's racial diversity as pressure to favor minorities in the hiring process, but concedes that he was never asked to favor any minority candidates; in fact, Mr. Brennan agrees that he has only ever hired the most qualified candidate for any given position, irrespective of race.  UMF ¶ 37.

Nor do Mr. Atkinson's statements that the "white numbers" for Mr. Brennan's department were "moving in the wrong direction" or that Mr. Brennan's department had "too many Asians" violate the law, as they do not create a hostile work environment for Mr. Brennan.  See Minarsky v. Susquehanna Cnty., 895 F.3d 303, 310 (3d Cir. 2018) (hostile work environment claim requires intentional discrimination on the basis of protected status).

Under these circumstances, Mr. Brennan did not protest City hiring practices that actually broke the law, as he had no evidence that any City agency hired any employee because of that employee's race, and Mr. Atkinson's comments did not, alone, violate any law.  At best, he protested actions which he believed could have led to an illegal action—a hypothetical violation.  Reports of hypothetical or potential violations are not reports of wrongdoing, within the meaning of the PWL.  Greco v. Meyer Coach Lines, Inc., 199 A.3d 426, 434 (Pa. Super. 2018) allocatur denied, 208 A.3d 462 (Pa. 2019) (to sustain a PWL claim, a plaintiff's report "must be of an actual violation, not a potential or contemplated violation.")  In short, Mr. Brennan has not identified any law—anti-discrimination or otherwise—violated by

either Mr. Atkinson's comments or the City's actual hiring practices.  Therefore, his

PWL claims based on his report of Mr. Atkinson's statements and the pressure he

felt Mr. Atkinson was applying, fail.

> ii. **Mr. Brennan's PWL Claims Related to His Reports Concerning the City's Potential Issuance of a Body-Worn Cameras RFP, the City's Decision to Use a Cooperative Purchasing Agreement to Purchase Those Cameras, and the City's Refusal to Seek a Second Penalty from Comcast Pursuant to the Franchise Agreement Fail Because Those Reports Were of Prospective or Hypothetical Wrongdoing and Waste.**

Alternatively, Mr. Brennan has alleged that the City violated the PWL by

terminating him for: (1) protesting the City's proposed RFP to procure body-worn

cameras, which, if it had been issued, would have violated City procurement rules;

(2) protesting the City's decision to use a cooperative purchasing agreement to

procure those cameras, which he has alleged constituted "substantial waste" of

taxpayer dollars; and (3) protesting the City's decision to "take it easy" on Comcast

during franchise agreement breach negotiations, which again constituted

"substantial waste."  None of these reports are protected under the PWL because, in

each case, the complaint was of a hypothetical violation or hypothetical waste.

Again, to sustain a PWL claim, a plaintiff's report "must be of an actual

violation, not a potential or contemplated violation." Greco, 199 A.3d at 434;

Anderson v. Bd. of School Directors of Millcreek Tp. School Dist., 574 Fed. Appx.

169, 173-74 (3d Cir. 2014) (statement regarding potential or hypothetical

wrongdoing does not constitute a report of wrongdoing under the PWL); Sukenik,

131 A.3d at 559 ("[A] report of hypothetical loss is insufficient to trigger the Whistleblower Law's protection.")

In <u>Greco</u>, the plaintiff informed the company's owners that their decision to allow a bus driver who had recently had a pacemaker inserted violated a PennDOT safety rule. <u>Greco</u>, 199 A.3d at 428. Although the company's owners ultimately agreed to keep the driver off the road, they subsequently terminated the plaintiff's employment. <u>Id.</u> at 429. The Superior Court held that the plaintiff's PWL claim failed because, although her report had prevented an illegal act from occurring, she only reported a potential, not actual, violation of the law. <u>Id.</u> at 434.

### 1. Mr. Brennan's report that the body-worn cameras RFP violated procurement rules concerned only potential or theoretical wrongdoing because the City never issued that RFP.

Mr. Brennan has repeatedly argued that he was terminated for opposing the City's proposed RFP to procure body-worn cameras, which, had the RFP been issued, would have allegedly violated City procurement rules. Mr. Brennan, however, concedes that the RFP in question was never issued, due, at least in part, to his opposition. UMF ¶ 48. Like the plaintiff's report in <u>Greco</u>, Mr. Brennan's expression of dissatisfaction with an RFP that was never issued simply does not constitute a report of wrongdoing for purposes of the Whistleblower Act, dooming any PWL claim premised on complaining about that RFP. <u>See</u> <u>Greco</u>, 199 A.3d at 434.

      **2.**  **Mr. Brennan's assertion that the City wasted money by using a cooperative purchasing agreement to procure body cameras is pure speculation.**

Mr. Brennan's PWL claim premised on protesting the City's cooperative purchasing agreement to procure the body-worn cameras as "substantial waste" of taxpayer dollars likewise fails for two independent reasons.

First, as a preliminary matter, Mr. Brennan has not provided evidence that he ever reported that the use of a cooperative purchasing agreement to procure body-worn cameras rather than an RFP would waste taxpayer dollars, or that he even opposed the City's decision to use a cooperative purchasing agreement.  Mr. Brennan testified at his deposition that his opposition to the body-worn cameras procurement process ended at the May 2017 meeting and that during that meeting he opposed the City's attempt to use what he deemed an inappropriate RFP to procure those cameras.  UMF ¶¶ 46-47.  Mr. Brennan did not testify that he also opposed the City's decision to use a cooperative purchasing agreement during that meeting.

Second, even if Mr. Brennan has shown that he opposed the cooperative purchasing agreement as "wasteful," Mr. Brennan's allegation of substantial waste is nothing more than speculation.  At the point at which he would have complained, May 2017, the City had not yet purchased the body-worn cameras.  Any allegation that purchasing them would have wasted money is a report of a hypothetical, rather than an actual, violation.  Moreover, Mr. Brennan has admitted that he is unaware of any comparably-sized city that has paid less than Philadelphia to deploy body-

worn cameras to a police force.  Id. ¶ 52.  He relies solely on his speculation that a public bidding process would have resulted in savings for the City, without producing any evidence supporting his assertion that such a process would have resulted in savings at all, much less substantial savings.

Additionally, even if Mr. Brennan was able to produce evidence that a public bidding process would have resulted in the City paying less money for to purchase body-worn cameras, it is undisputed that an RFP-type of process could have resulted in a delay in procuring the cameras, would have necessitated a wholesale replacement of the City's digital evidence management system, with concomitant re-training for end users of any new system, and may have resulted in the City purchasing a camera system that had not been tested in real-world conditions.  Id. ¶ 50.  Waste must be judged based on what is being purchased; a Rolex is worth more than a Casio, even if they both tell time.  Pilot-tested body-worn cameras, compatible with existing infrastructure, that could be purchased and distributed quickly with a minimum of additional training were worth more to the City than the nebulous hope that camera systems procured in the future through a different method *might* be less expensive.  Choosing the former, rather than the latter, is simply not waste.

In short, the City's decision to move forward using a cooperative purchasing agreement appropriately balanced the City's objectives in obtaining suitable body-worn cameras quickly and at an appropriate cost to the City.  Accordingly, Mr.

Brennan's report (if it occurred) of waste related to the procurement process was, at best, speculative, and cannot, therefore, form the basis for a PWL claim.

> **3. Mr. Brennan's report that refraining from further penalizing Comcast for a second franchise agreement breach constituted waste was wholly theoretical because he was terminated before he could determine that Comcast had breached the agreement a second time.**

Mr. Brennan has also argued that Defendants violated the PWL because, according to him, they terminated his employment because he objected to being asked to "take it easy" on Comcast during franchise agreement breach negotiations. This claim fails because, when Mr. Brennan complained about not penalizing Comcast for breaching the franchise agreement, no such breach had occurred. Id. ¶¶ 61-62. In contrast, Comcast was, at that point, representing that they would be in compliance with the agreement by the relevant deadline. Id. ¶ 63. Mr. Brennan admitted during his deposition that he was terminated before he could determine whether a breach had occurred and remained unaware of whether Comcast had breached the agreement a second time. Id. ¶ 64. Accordingly, Mr. Brennan's report of waste related to the Comcast franchise agreement breach negotiation was pure speculation and cannot form the basis for a PWL claim.

> **iii. Mr. Brennan's PWL Claim Fails Because He Has Produced No Concrete Evidence of a Causal Connection Between Any Protected Activity and His Termination.**

Even if this Court concludes that Mr. Brennan has offered evidence that he reported conduct that was, objectively, either waste or wrongdoing, he has failed to produce concrete evidence linking his reports with his termination.

An employee must prove a causal connection between a report of waste or wrongdoing and an adverse employment action to sustain a PWL claim.  43 P.S. § 1423(a) (plaintiff must show termination occurred "**because** the employee . . . ma[de] a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste") (emphasis added); McAndrew v. Bucks Cnty. Bd. Of Com'rs, 982 F. Supp. 2d 491, 503 (E.D.Pa. 2013) ("[T]o make out a case of retaliatory termination [under the PWL], a plaintiff must plead…a causal connection between the report of wrongdoing and an adverse employment action.").  Unlike a First Amendment or Title VII retaliation claim, "petty" conduct and harassment by supervisors that does not materially affect an employee's terms or conditions of employment cannot form the basis for a PWL claim.  See O'Rourke v. Commonwealth, 778 A.2d 1194, 1197-99 (Pa. 2001) ("petty conduct…did not materially affect [O'Rourke's] terms or conditions of employment").

"Under Pennsylvania law, in order to show a causal connection, a plaintiff must 'show by concrete facts or surrounding circumstances that the report [of wrongdoing or waste] led to [the plaintiff's] dismissal, such as that there was specific direction or information received not to file the report or [that] there would be adverse consequences because the report was filed.'"  Cavicchia v. Philadelphia Hous. Auth., No. 03-0116, 2003 WL 22595210, *15 (E.D. Pa. Nov. 7, 2003) (quoting Golaschevsky v. Com., Dept. of Environmental Protection, 720 A.2d 757, 759 (Pa. 1998)).  A plaintiff's causation burden under the Whistleblower Law is more stringent than under Title VII and the First Amendment, in that courts have held

34

that close temporal proximity alone is insufficient to prove retaliation in PWL

claims.  Id.; Evans v. Thomas Jefferson Univ., 81 A.3d 1062, 1070-71 (Pa. Commw.

2013) (holding that mere temporal proximity between a report of wrongdoing and a

retaliatory action was insufficient to prove causation for a PWL claim);

Golaschevsky, 720 A.2d at 759-60 (four months proximity insufficient); Gray v.

Hafer, 651 A.2d 221, 225 (Pa. Commw. 1994) (adverse action taken "within a given

amount of time" after report insufficient).

As discussed *infra*, even if Mr. Brennan had reported actual waste or

wrongdoing, he has failed to provide concrete evidence linking any such reports to

his termination, particularly where, under the heightened causation standard

applied to PWL claims (as opposed to retaliation claims under anti-discrimination

statutes) temporal proximity alone is insufficient to prove causation.  Accordingly,

Mr. Brennan's PWL claims fail.

### iv.  Mr. Brennan's PWL Claims Fail Because Defendants Have Provided Proof That They Would Have Terminated Mr. Brennan Regardless of Any Protected Activity.

The PWL uses a burden shifting scheme identical to that used in Title VII

discrimination cases; once a plaintiff has "satisfied the threshold showing of a

causal connection," the burden shifts to the defendant to show a separate and

legitimate reason for its actions.  Evans, 81 A.3d at 1070.  For the reasons discussed

*infra*, Defendants have shown that they terminated Mr. Brennan due to his

continued failure to willingly participate in the growth and development of his

communication skills, an area in which Defendants (and others) viewed Mr. Brennan as lacking.

Therefore, because Defendants have provided evidence showing that they had a separate and legitimate reason for terminating Mr. Brennan, this Court should enter summary judgment in their favor on Mr. Brennan's PWL claims.

## V.   CONCLUSION

Defendants City of Philadelphia, James Kenney, Jane Slusser, and Christine Derenick-Lopez respectfully request that this Honorable Court grant this Motion and enter judgment in their favor on all claims.

Respectfully Submitted,

CITY OF PHILADELPHIA
LAW DEPARTMENT

Date:  October 11, 2019              BY:    s/ Christopher H. Rider
                                     Christopher H. Rider
                                     Divisional Deputy City Solicitor

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CHARLES BRENNAN,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 18-1417 |
| | : | |
| **CITY OF PHILADELPHIA, et al.,** | : | |
| | : | |
| Defendants. | : | |

## CERTIFICATE OF SERVICE

I hereby certify that on the date below, the foregoing Motion for Summary Judgment and Memorandum of Law has been filed electronically and is available for viewing and downloading.


Respectfully Submitted,

CITY OF PHILADELPHIA
LAW DEPARTMENT

Date: <u>October 11, 2019</u>          BY:   <u>s/ Christopher H. Rider</u>
Christopher H. Rider
Divisional Deputy City Solicitor