**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHARLES BRENNAN,** | | **CIVIL ACTION** |
| **Plaintiff,** | | |
| **v.** | | |
| **CITY OF PHILADELPHIA,** | | **NO.  18-1417** |
| **MAYOR JAMES F. KENNEY,** | | |
| **CHRISTINE DERENICK-LOPEZ, and** | | |
| **JANE SLUSSER,** | | |
| **Defendants.** | | |

DuBois, J.                                                                                          June 30, 2020

## M E M O R A N D U M

## I.      INTRODUCTION

This is a retaliation case arising from the termination of plaintiff, Charles Brennan, from

his position as Chief Information Officer ("CIO") for the City of Philadelphia ("the City").

Plaintiff alleges that defendants, the City, Mayor James F. Kenney, and two senior City

officials—Christine Derenick-Lopez and Jane Slusser—retaliated against him for voicing

concerns over multiple purportedly unlawful and wasteful City practices, including racially

discriminatory hiring and the violation of public contract award requirements.  Plaintiff asserts

six causes of action of retaliation under federal, state, and local law.  Presently before the Court

is defendants' motion for summary judgment.  For the reasons that follow, the motion is granted.

## II.     BACKGROUND[1]

On January 11, 2016, plaintiff was hired as the City's CIO, responsible for overseeing the

City Office of Innovation and Technology ("OIT").  Defs.' Statement Undisputed Material Facts

---

[1] The facts are presented in the light most favorable to plaintiff.  Disputed facts are noted as such.  Where appropriate, plaintiff and the defendants' statements of material facts are cited in lieu of a direct citation to the record.

("Defs.' SUMF") ¶ 4.  Between January 2016 and December 2016, plaintiff reported to, and was supervised by, Rebecca Rhynhart, the City's Chief Administrative Officer ("CAO").  *Id.* ¶ 7. Rhynhart resigned in December 2016, after which she was replaced by defendant Christine Derenick-Lopez.  *Id.* ¶ 9.  Over the next two years, plaintiff reported several concerns to City officials regarding: (1) City hiring practices that he believed were racially discriminatory; (2) the City's failure to competitively bid a public contract for police body cameras; (3) enforcement of a contract with Comcast, a City vendor; and (4) requests by Derenick-Lopez that he attend sensitivity training, which he believed were discriminatory.  Plaintiff asserts that his termination on January 12, 2018, was retaliation for raising these various concerns to City officials.  *Id.* ¶ 101.

### A.    The City's Diversity Initiative and Allegedly Discriminatory Hiring Practices

First, plaintiff alleges retaliation for complaints he raised about purported racially discriminatory hiring practices by the City.  Following the election of Mayor Kenney in November of 2015, the City began planning an employment initiative to diversify the municipal workforce (the "diversity initiative").  *Id.* ¶ 11.  To implement this initiative, the City's Chief Diversity Officer, Nolan Atkinson, met with City department heads, including plaintiff, on a quarterly basis to review the racial composition of their respective departments.  *Id.* ¶ 19. According to plaintiff, during his first meeting of 2017 with Atkinson, in or around early May of 2017, Atkinson told plaintiff that the "White numbers" for OIT were "moving in the wrong direction," and that OIT had "too many Whites" and "too many Asians."  *Id.*  ¶ 24; Defs.' Mot. Summ. J. ("Defs.' Mot.") Ex. B ("Brennan Dep.") 59:1–7.[2]  Plaintiff testified that, in response, he disputed Atkinson's demographic data and told Atkinson that given the shortage of

---

[2] During his deposition, Atkinson denied that he made these statements.  However, defendants accept plaintiff's allegations about Atkinson's comments for purposes of their motion for summary judgment.  Defs.' SUMF ¶ 24 n.1.

applications by Hispanic and African American candidates, "the only way I could get to his number was [to] discriminate against Whites and Asians . . . . [W]e can't do that, it's illegal to do that." Pl.'s Counterstatement Material Facts ("Pl.'s CMF") ¶ 66; Brennan Dep. 60:1–17.

According to plaintiff, approximately one week later, he first complained to Derenick-Lopez that Atkinson's comments and instructions to increase OIT diversity were "offensive and discriminatory" and told her that "we couldn't do them." Defs.' SUMF ¶ 28; Brennan Dep. 65:19–24. Derenick-Lopez admitted that the leaders of two other City departments raised similar concerns to her about feeling "pressured to hire people of certain races" by Atkinson. Defs.' SUMF ¶ 30; Defs.' Mot. Ex. D ("Derenick-Lopez Dep.") 129:5–10. Derenick-Lopez relayed these complaints to defendant Jane Slusser, the Mayor's Chief of Staff. Defs.' SUMF ¶ 31.

Plaintiff testified that he complained to Derenick-Lopez "multiple times" about Atkinson and "what [he] felt was undue pressure to discriminate against people" through the summer and fall of 2017, though he did not provide specific dates. Pl.'s CMF ¶ 70; Brennan Dep. 69:24–70:3. Derenick-Lopez testified she did not recall that plaintiff raised any additional complaints about race and hiring. Derenick-Lopez Dep. 133:2–134:8. Plaintiff concedes that Mayor Kenney had no knowledge of these complaints about Atkinson and the implementation of the diversity initiative. Pl.'s Resp. Defs.' SUMF ¶ 98.

### B.    The Police Body Camera Bidding Process

Second, plaintiff alleges that defendants terminated his employment in retaliation for concerns he voiced about a City contract to purchase body-worn cameras for Philadelphia police officers. When plaintiff was hired as CIO, the City was engaged in an ongoing pilot program with Axon Enterprises, Inc. ("Axon") to test body cameras. Defs.' SUMF ¶¶ 38–39. In April of 2017, plaintiff received a draft request for proposal ("RFP") related to the purchase of 4,000

cameras.  *Id.* ¶ 40.  Plaintiff thought the RFP violated City procurement rules and state anti-bid

rigging law because only one vendor, Axon, could qualify to submit a bid under its terms.  Pl.'s

CMF ¶ 97.  Plaintiff reported these concerns to James White, the OIT Integrity Officer, who

communicated with Ellen Kaplan, the City's Chief Integrity Officer, about the issue.  *Id.*  ¶¶ 98–

99.  On April 6, 2017, Kaplan emailed Slusser and three other City officials to inform them of

OIT's concerns about the RFP.  *Id.* ¶ 100; Pl.'s Opp'n Ex. W.

On or about May 11, 2017, plaintiff attended a meeting to discuss procurement of the

body cameras with multiple City officials, including Derenick-Lopez, Kaplan, Slusser, and Brian

Abernathy, the City's First Deputy Managing Director.  Defs.' SUMF ¶ 46; Brennan Dep.

106:16–17.  According to plaintiff, at the meeting Abernathy "scolded me immediately" for

opposing the RFP and "blew me off."  Brennan Dep. 107:1–15.  In response, plaintiff said he

thought the draft RFP was "rigged" for Axon and violated City procurement rules.  *Id.* at

143:14–144:3.  After the meeting, the City did not issue the RFP.  Defs.' SUMF ¶ 48.  Instead,

the City procured the cameras from Axon using a cooperative purchasing agreement—which

bypassed the competitive bidding process—for approximately $12.5 million.  Defs.' SUMF ¶ 49;

Pl.'s CMF ¶ 110.  Plaintiff did not raise any additional complaints about body camera

procurement between the meeting on May 11, 2017 and the end of his employment with the City.

Defs.' SUMF ¶ 51.

Plaintiff testified that he believed his relationship with Derenick-Lopez became more

hostile following the meeting of May 11, 2017.  Brennan Dep. 42:15–18.  According to plaintiff,

Derenick-Lopez began disregarding his advice about software purchases, "using" plaintiff's

employees without informing him, and making plans for OIT without his involvement.  Defs.'

SUMF ¶¶ 53–55; Pl.'s CMF ¶¶ 138–144.  In addition, plaintiff testified that the "tenor" of his

4

weekly meetings with Derenick-Lopez "changed drastically" and became "caustic screaming matches." Brennan Dep. 177:16–23.

### C. Comcast Franchise Agreement

Third, plaintiff alleges retaliation for his complaints about Comcast's failure to meet certain deadlines required by its cable franchise agreement with the City. The franchise agreement required that Comcast perform repair work on its cable and fiber optic network by quarterly deadlines. Defs.' SUMF ¶ 57; Brennan Dep. 153:5–9. Under the agreement, Comcast's failure to meet the deadlines would result in penalties. Defs.' SUMF ¶ 59. As CIO, plaintiff monitored Comcast's compliance and was responsible for enforcing any penalties under the agreement. Pl.'s CMF ¶ 120. Comcast missed the June 30, 2017 deadline to fix certain portions of the network and, as a result, paid the City a $250,000 penalty pursuant to the terms of the agreement. Defs.' SUMF ¶¶ 57–59.

In November of 2017, plaintiff concluded that Comcast would likely fail to meet its next deadline, on December 31, 2017. *Id.* ¶ 60. According to plaintiff, on multiple occasions in November and December 2017, he told Derenick-Lopez that he thought Comcast might be liable for a second penalty. Brennan Dep. 156:1–4, 202:18–203:4. Plaintiff testified that, in response, Derenick-Lopez told him the Mayor's Office wanted him to "take it easy" on Comcast. Defs.' SUMF ¶ 62. Plaintiff replied that he would not "take it easy." Pl.'s CMF ¶ 129; Brennan Dep. 157:1–6; 225:17–226:2. Derenick-Lopez said she encouraged plaintiff to negotiate any disagreements with Comcast. Derenick-Lopez Dep. 167:23–168:7. Plaintiff was terminated before he could determine whether Comcast finished the required repairs by the December 31, 2017 deadline. Defs.' SUMF ¶ 64.

### D.      Sensitivity Training

Finally, plaintiff alleges that defendants retaliated against him after he resisted requests by Derenick-Lopez that he attend sensitivity training in the weeks before he was terminated. Derenick-Lopez communicated these requests after two episodes in which plaintiff allegedly made inappropriate public comments: first, before a July 18, 2017 meeting between City officials and executives of SAP, a City technology vendor (the "SAP meeting"); and second, at an October 12, 2017 conference hosted by the City and coordinated by plaintiff (the "Smart Cities Conference").  Defs.' SUMF ¶¶ 67–69, 78–79; Pl.'s CMF ¶ 148.

Two of the City officials who attended the SAP meeting with plaintiff—Harold Epps and Dawn Somerville—testified that, on the way to the meeting, plaintiff commented on the appearance and age of the female SAP executive with whom they were scheduled to meet. Def.'s SUMF ¶ 68.  According to Epps, plaintiff said "either she's too young to have that job or she's too pretty to have that job, one or the other."  Defs.' Mot. Ex. I ("Epps Dep.") 54:21–55:6. Similarly, Sommerville testified that plaintiff "made a comment about her age and I believe it was a comment about how pretty do you have to be—like, it was a comment of her age and how pretty you must be to move up that fast."  Defs.' Mot. Ex. J ("Sommerville Dep.") 31:7–17. Plaintiff denied having made either comment.  Pl.'s Resp. Defs.' SUMF ¶¶ 68–69.  In addition, Sommerville testified that plaintiff made a comment about his female employees having more shoes than his male employees.  Defs.' SUMF ¶ 71.  Plaintiff conceded that he made this comment.

On or around the day after the SAP meeting, Epps and Sommerville reported concerns about plaintiff's comments to Derenick-Lopez and informed her that they did not want plaintiff to accompany them on future business attraction and retention trips.  *Id.* ¶ 74.  That same day,

plaintiff and Derenick-Lopez spoke by telephone to discuss the SAP meeting.  *Id.* ¶ 75.
Derenick-Lopez testified that she relayed the concerns of Epps and Sommerville to plaintiff and
told him, "[Y]ou need to go to sensitivity training, this is something you need to do."  Derenick-
Lopez Dep. 61:8–14.  According to Derenick-Lopez, she recommended that plaintiff speak to
Jackie Linton, the City's Deputy Managing Director for Human Resources, to identify possible
training classes.  *Id.*  Plaintiff testified that he interpreted Derenick-Lopez's instruction as "an
offhand comment" and "took [it] almost as a joke from her."  Brennan Dep. 68:11–17, 164:7–
166:7, 168:1–10.  He did not participate in sensitivity training as a result of that conversation.

Approximately three months later, the City hosted the Smart Cities Conference.  Defs.'
SUMF ¶ 78.  Plaintiff, concerned that attendees were leaving the conference early, addressed the
attendees to encourage them to stay for happy hour.  *Id.* ¶ 79.  According to plaintiff, "I told
everybody, 'Hey, we hired a chef, a famous chef, he's going to be making signature drinks and
signature hors d'oeuvres.' . . . I said, 'I want you all to stick around, because most of us can't
afford this stuff.'"  Brennan Dep. 170:4–9.  Derenick-Lopez and another City employee present
at the conference, Jeanette Bruno, witnessed plaintiff make this comment.  Defs.' SUMF ¶ 81.
Later in October of 2017, Derenick-Lopez told plaintiff that she overheard other attendees state
that his comment about the happy hour was offensive.  Brennan Dep. 170:22–171:2; Derenick-
Lopez Dep. 98:4–24.

Following that conversation, Derenick-Lopez called Linton to check whether plaintiff
had attended sensitivity training as she had directed him to after the SAP meeting.  Defs.' SUMF
¶ 82.  After Linton told Derenick-Lopez that plaintiff had not attended sensitivity training,
Derenick-Lopez asked Linton to schedule training for plaintiff.  *Id.*  Mayor Kenney testified that
Derenick-Lopez informed him and Slusser of her intentions to send plaintiff to sensitivity

7

training.  Defs.' Mot. Ex. N ("Kenney Written Dep.") ¶¶ 49–50.  Linton worked with plaintiff to identify training options and sent his preferred courses to Derenick-Lopez for her approval.  Defs.' SUMF ¶ 83.  Derenick-Lopez approved two of the options, but on October 31, 2017, plaintiff wrote in an email to Linton that "[Derenick-Lopez] has not ordered me to go and I won't unless she does.  And if she does I will bring up other offensive behavior."  Defs.' Ex. M.

Notified of plaintiff's resistance, Derenick-Lopez called plaintiff in early December 2017 to discuss sensitivity training.  Def.'s SUMF ¶¶ 85–86.  Derenick-Lopez testified that she asked plaintiff why he did not want to attend the training.  Derenick-Lopez Dep. 200:1–9.  In reply, plaintiff said he thought the request was unfair because Derenick-Lopez "use[d] the F bomb all the time" and Atkinson "made very offensive comments," and neither was sent to sensitivity training.  Brennan Dep. 194:1–10.  Further, plaintiff testified that he told Derenick-Lopez that he would not attend sensitivity training unless she ordered him to do so.  Defs.' SUMF ¶ 86.  He also informed Derenick-Lopez that if she did order him, he would file a charge with the Equal Employment Opportunity Commission ("EEOC") because he felt the request was "discriminatory and inappropriate" and that Derenick-Lopez only sent white males to sensitivity training.  *Id.*; Brennan Dep. 193:11–24.  Derenick-Lopez testified that she did not feel it was appropriate to order plaintiff to attend sensitivity training because he was a senior City official.  Defs.' SUMF ¶ 88.

According to plaintiff, he and Derenick-Lopez argued one additional time between their early December telephone conversation and his termination.  Brennan Dep. 197:18–198:17.  Plaintiff testified that Derenick-Lopez "got upset" with him during an argument over whether the Deputy CAO gave plaintiff incorrect directions about sending information to the City Finance Department.  *Id.* 198:1–17.  Nevertheless, plaintiff testified that he thought his relationship with

Derenick-Lopez "turned around" after their telephone conversation and that "by Christmas, we seemed to be friends again."  *Id.* 196:21–24.

Separate from the events immediately surrounding the SAP meeting and Smart Cities Conference, two witnesses testified about plaintiff's inappropriate communication style based on their interactions with him.  Rhynhart, plaintiff's prior supervisor, stated that plaintiff sometimes spoke "in a very direct fashion."  *Id.* ¶ 65.  Similarly, White said that plaintiff "can be abrasive" and was "definitely not always politically correct."  *Id.* ¶ 66; Def.'s Mot. Ex. F ("White Dep.") 44:3–8.

### E.    The Decision to Terminate Plaintiff

Derenick-Lopez testified that after her early December 2017 conversation with plaintiff about sensitivity training, she called Slusser and told her that plaintiff "was not the right fit for this kind of role."  Derenick-Lopez Dep. 203:20–204:8.  Slusser testified that she and Derenick-Lopez discussed plaintiff's actions and made the decision to terminate plaintiff together.  Defs.' Mot. Ex. A ("Slusser Dep.") 153:7–18.  Derenick-Lopez said that she "needed [plaintiff] to be more sensitive about how he communicated, both externally and internally."  Derenick-Lopez Dep. 211:1–12.  She also testified that she based her decision on the fact that plaintiff "was asked and given the tools to correct his behavior and he wasn't open to that feedback and he didn't think he did anything wrong."  *Id.* at 211:13–18.

In early January of 2018, Derenick-Lopez and Slusser met with Mayor Kenney and informed him of the decision to terminate plaintiff's employment.  Defs.' SUMF ¶ 95.  Mayor Kenney testified that he approved the decision "[b]ased on [Derenick-Lopez and Slusser's] representations to me regarding [plaintiff's] behavior, specifically that he had made comments

that warranted training, and that he had refused to address Ms. Derenick Lopez and Ms. Slusser's concerns by attending training."  Kenney Written Dep. ¶ 165.

On January 12, 2018, Derenick-Lopez and Slusser met with plaintiff and informed him that his employment as CIO was terminated.  Defs.' SUMF ¶ 101.  Upon his termination, plaintiff was given a separation letter and a Release Agreement and Covenant Not to Sue ("severance agreement"), which required him to waive potential legal claims against the City. *Id.* ¶ 102; Pl.'s Br. Opp'n Defs.' Mot. Summ. J. ("Pl.'s Opp'n") Ex. OO.  Plaintiff did not accept the severance agreement.  Derenick-Lopez Dep. 209:21–23.  At the January 12, 2018 meeting, plaintiff provided Derenick-Lopez and Slusser with a written statement summarizing his prior disagreements with Derenick-Lopez and his perspective on the events leading up to his termination.  Pl.'s CMF ¶ 172; Pl.'s Opp'n Ex. QQ.  Prior to plaintiff's termination, plaintiff had not received any formal discipline and Derenick-Lopez had not reported any concerns about him to the City Human Resources Department.  Defs.' SUMF ¶ 94.

### F.     Procedural History

Plaintiff filed this action on April 4, 2018.   After defendants filed a motion to dismiss for failure to state a claim (Document No. 4, filed June 4, 2018), plaintiff filed a First Amended Complaint on June 18, 2018 (Document No. 5).  Defendants filed a second motion to dismiss on July 3, 2018 (Document No. 7), which the Court granted in part and denied in part by Memorandum & Order dated September 21, 2018 (Document No. 10).

On March 29, 2019, plaintiff filed a Second Amended Complaint (Document No. 21) asserting the following claims: retaliation under 42 U.S.C. § 1981 against all defendants (Count I); retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* against the City (Count II); retaliation under the First Amendment of the U.S. Constitution

pursuant to 42 U.S.C. § 1983 against all defendants (Count III); retaliation under the Pennsylvania Whistleblower Law ("PWL"), 43 Pa. Cons. Stat. § 1421 *et seq.* against all defendants (Count IV); retaliation under the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951 *et seq.* against all defendants (Count V); and retaliation under the Philadelphia Fair Practices Ordinance ("PFPO"), Phila. Code. § 9-1101 *et seq.* against all defendants (Count VI).

By Memorandum and Order dated July 25, 2019, the Court denied plaintiff's motion to compel the oral deposition of Mayor Kenney (Document No. 30). The Court directed plaintiff to start the deposition process with a limited deposition by written questions, without prejudice to plaintiff's right to seek a limited oral deposition after that procedure, if deemed necessary.

On October 11, 2019, defendants filed a motion for summary judgment (Document No. 36). The motion is fully briefed and ripe for decision.

## III.   LEGAL STANDARD

The Court will grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court's role at the summary judgment stage "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether . . . there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. However, the existence of a mere "scintilla" of evidence in support of the nonmoving party is insufficient.

11

*Id.* at 252.  In making this determination, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor."  *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007) (internal citations omitted).  The party opposing summary judgment must, however, identify evidence that supports each element on which it has the burden of proof.  *Celotex Corp.*, 477 U.S. at 322.

## IV.    DISCUSSION

Plaintiff asserts claims of retaliation under 42 U.S.C. § 1981, Title VII, the PHRA, PFPO, PWL, and First Amendment based on his various complaints about illegal or wasteful City practices.  These complaints can be separated into four categories: (1) complaints about implementation of the City's diversity initiative and hiring practices; (2) complaints about the body camera bidding process; (3) complaints about the Comcast franchise agreement; and (4) complaints about being asked to attend sensitivity training.  In their motion for summary judgment, defendants contend that plaintiff was terminated not because he raised these complaints, but because he failed to attend attending sensitivity training as directed by Derenick-Lopez after she relayed concerns about his communication style.  For the reasons that follow, the motion for summary judgment is granted.

### A.    Retaliation Under § 1981, Title VII, the PHRA, and PFPO (Counts I, II, V, & VI) [3]

Section 1981, Title VII, the PHRA, and PFPO prohibit employers from retaliating against

---

[3] Plaintiff asserts his Title VII retaliation claim (Count II) against the City alone because only employers—not individual employees—may be held liable under Title VII.  *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1077 (3d Cir. 1996).  Plaintiff brings his § 1981, PHRA, and PFPO claims (Counts I, V-VI) against all defendants because, unlike Title VII, these statutes provide for liability of both employers and individual defendants for unlawful discrimination and retaliation.  *See* 43 Pa. Cons. Stat. §§ 955(d), (e); Phila. Code. §§ 9-1103(1)(g), (h); *Fleet v. CSX Intermodal, Inc.*, No. CV 17-3562, 2018 WL 1217156, at *4 (E.D. Pa. Mar. 8, 2018) (noting that "Section 955(d) of the PHRA and Section 9-1103(1)(g) of the PFPO impose liability on 'any person' for retaliation" or aiding and abetting unlawful discriminatory employment practices); *see also Thomas v. St. Mary Med. Ctr.*, 22 F. Supp. 3d 459, 467 n.9 (E.D. Pa. 2014) ("Individuals may be held liable under § 1981.") (citing *Al-Khazraji v. Saint Francis Coll.*, 784 F.2d 505, 518 (3d Cir. 1986)).

employees for complaining about, or reporting, racial discrimination or retaliation.  *See, e.g.*, *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 256 (3d Cir. 2017) (Title VII and § 1981); *Ahern v. Eresearch Tech., Inc.*, 183 F. Supp. 3d 663, 670 (E.D. Pa. 2016) (PHRA and PFPO).  Plaintiff asserts that defendants terminated him in retaliation for complaining about the City's alleged racially discriminatory hiring practices and Derenick-Lopez's allegedly discriminatory request that he attend sensitivity training—the first and last categories of complaints listed above.

Because plaintiff seeks to prove his case with indirect evidence, his claims are governed by the familiar burden-shifting framework of *McDonnell Douglas Corporation v. Green,* 411 U.S. 792 (1973).[4]  *See Daniels v. Sch. Dist. of Phila.,* 776 F.3d 181, 193 (3d Cir. 2015).  Under the *McDonell Douglas* framework, a plaintiff first bears the burden of establishing a *prima facie* case of retaliation.  *Moore v. City of Phila.*, 461 F.3d 331, 340 (3d Cir. 2006), *as amended* (Sept. 13, 2006).  If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to produce evidence of a legitimate, non-retaliatory reason for the adverse employment action.  *Id.* at 342.  The burden is one of production, not persuasion.  *Daniels*, 776 F.3d at 193.  If the defendant offers a legitimate, non-retaliatory explanation, in order to survive summary judgment the plaintiff must then submit evidence that the defendant's "proffered explanation was false

---

[4] Courts in the Third Circuit apply the *McDonnell Douglas* framework to retaliation claims asserted under § 1981, Title VII, the PHRA, and PFPO.  *See Anderson v. Boeing Co.*, 694 F. App'x 84, 86 n.4 (3d Cir. 2017); *Fleet v. CSX Intermodal, Inc.*, No. CV 17-3562, 2018 WL 3489245, at *14 (E.D. Pa. July 18, 2018).  In retaliation claims under § 1981, a plaintiff must also establish an underlying § 1981 violation.  *See Estate of Oliva v. State of NJ*, 604 F.3d 788, 798 (3d Cir. 2010); *Ellis v. Budget Maint., Inc.*, 25 F. Supp. 3d 749, 755 (E.D. Pa. 2014) (applying the *Oliva* requirement for an underlying § 1981 violation).

With respect to plaintiff's § 1981 claim against the City, plaintiff must also establish that his injuries were proximately caused by a municipal policy or custom.  *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978); *McGovern v. City of Phila.*, 554 F.3d 114, 121 (3d Cir. 2009) (extending *Monell* to cases arising under § 1981).  Because the Court concludes that plaintiff's termination was not retaliatory, the Court does not reach the question of whether plaintiff's termination was caused by a municipal policy or custom.

[that is, a pretext], and that retaliation was the real reason for the adverse employment action." *Moore*, 461 F.3d at 342 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500–01 (3d Cir. 1997)).  Notwithstanding this burden-shifting framework, the plaintiff always bears the ultimate burden of persuading the trier of fact that the defendant retaliated against him.  *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 301 n.11 (3d Cir. 2007), *as amended* (Aug. 28, 2007).

       *1.*      Prima Facie *Case of Retaliation*

To establish a *prima facie* case of retaliation in violation of § 1981, Title VII, the PHRA, and PFPO, plaintiff must show that (1) he engaged in protected activity, (2) defendants took an adverse employment action against him during or after the protected activity and (3) there was a causal link between the protected activity and the adverse employment action.  *Moore*, 461 F.3d at 340–41.

Defendants do not contest that plaintiff has satisfied the first two elements: his complaints about racial discrimination and threat of filing an EEOC charge to Derenick-Lopez were protected activities, and his termination constituted an adverse employment action.  *See, e.g.*, *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 n.9 (3d Cir. 2007) (holding that protected activity "can take the form of informal protests of discriminatory employment practices, including making complaints to management"); *Dreshman v. Villa*, 733 F. Supp. 2d 597, 618 (W.D. Pa. 2010) ("Plaintiff's threat to file EEOC charges against [defendant employer] regarding alleged harassment would constitute protected activity.")

To prove causation at the *prima facie* stage, "a plaintiff need only proffer evidence sufficient to raise the inference that [his] engagement in a protected activity was the *likely reason* for the adverse employment action."  *Carvalho-Grevious*, 851 F.3d at 253.  Assuming *arguendo* that plaintiff established the required causal relationship for a *prima facie* case of retaliation, the

Court concludes his claims fail under the third step of the *McDonnell Douglas* framework because he has not produced evidence from which a reasonable jury could find that defendants' proffered reason for his termination was pretextual.

> 2.     *Legitimate Non-Retaliatory Reason*

At the second step of the *McDonell Douglas* framework, defendants must advance a legitimate, non-retaliatory reason for terminating plaintiff's employment.  Derenick-Lopez, Slusser, and Mayor Kenney testified that plaintiff was fired because he made inappropriate public comments and failed to address concerns about his communication style by attending sensitivity training.  Defs.' SUMF ¶¶ 92–93; Slusser Dep. 72:18–73:5; 153:7–18; Kenney Written Dep. ¶ 165.  This explanation meets defendants' "relatively light burden" of production under *McDonnell Douglas*.  *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)).

> 3.     *Pretext*

Based on such evidence, the burden shifts back to plaintiff at the third step of the *McDonnell Douglas* analysis to show that defendants' explanation is pretextual.  At this stage, plaintiff bears the ultimate burden to "prove that retaliatory animus was the 'but-for' cause of the adverse employment action."  *Pierce v. City of Phila.*, No. CV 17-05539, 2018 WL 6832093, at *13 (E.D. Pa. Dec. 28, 2018) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)).  To show pretext, plaintiff must identify "some evidence, direct or circumstantial, from which a factfinder would reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious [retaliatory] reason was more likely than not a . . . determinative cause of the employer's action."  *Fuentes*, 32 F.3d at 764; *see also Daniels*, 776 F.3d at 198 (applying *Fuentes* in the retaliation context).  Under both theories of pretext, the

Court concludes that plaintiff has produced insufficient evidence to permit a reasonable jury to conclude that defendants' proffered reason for his termination was pretextual.  The Court addresses each pretext theory in turn.

i.    First Theory of Pretext

Under the first theory of pretext, the "non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'"  *Fuentes*, 32 F.3d at 765 (internal citations omitted).  Because the focus of the analysis is the question of whether retaliatory animus motivated the employer, it is insufficient to show that the employer's decision was "wrong or mistaken."  *Dunsmuir v. May Dep't Stores Co.*, 120 F. App'x 927, 930 (3d Cir. 2005).  Rather, to prove pretext, a plaintiff must demonstrate that "the employer's proffered reason . . . was so plainly wrong that it cannot have been the employer's real reason."  *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997).

Plaintiff's evidence in support of the first pretext theory may be separated into four categories: (1) factual disputes regarding the reason for his termination; (2) inconsistencies in defendants' testimony; (3) defendants' failure to investigate his complaints; and (4) defendants' deviation from internal policies governing discipline and severance agreements for terminated employees.  The Court addresses each category of evidence in turn.

First, plaintiff contends that two factual disputes regarding his own conduct support his claim of pretext.  He maintains that, contrary to the testimony of Epps and Sommerville, he never made a comment regarding the age and appearance of the female SAP executive on July 18, 2017, although he does not dispute his statement that his female employees had more shoes

than his male employees.  In addition, plaintiff asserts that he never refused to attend sensitivity training, and instead informed Derenick-Lopez that he thought the request was discriminatory and would attend only if she "ordered" him.  Pl.'s Opp'n 22.  Plaintiff argues that these factual disputes call into question the basis for Derenick-Lopez's original request that he attend sensitivity training and the justification for the final decision terminating him.

Plaintiff's arguments regarding these factual disputes are unavailing because, to demonstrate pretext, he must do more than prove that his termination was unwarranted or an extreme punishment for his behavior.  *See Kilpatrick v. Sec'y, U.S. Dep't of Veterans Affairs*, 754 F. App'x 123, 127 (3d Cir. 2018) ("The excessiveness of the action taken, though, does not bolster the position that the likely reason for it was retaliation."); *Emmett v. Kwik Lok Corp.*, 528 F. App'x 257, 261 (3d Cir. 2013).  With respect to the complaints of Epps and Sommerville, courts in the Third Circuit "have held that when co-worker complaints prompt adverse employment action, '[i]t is not the veracity of the allegations . . . which is at issue, but rather the integrity of [the employer's] decision-making process."  *Proudfoot v. Arnold Logistics, LLC*, 59 F. Supp. 3d 697, 707 (M.D. Pa. 2014) (quoting *Ade v. KidsPeace Corp.,* 698 F. Supp. 2d 501, 517 (E.D. Pa. 2010) (DuBois, J.)).  In assessing the integrity of the decision-making process, the Court must determine "whether the employer *reasonably believed* the employee's allegation and acted on it in good faith, or to the contrary, the employer did not actually believe the co-employee's allegation but instead used it as pretext for an otherwise discriminatory dismissal."  *Ade*, 698 F. Supp. 2d at 517 (internal citation and quotation marks omitted).  Plaintiff has failed to provide any evidence that defendants did not reasonably believe the reports of Epps and Sommerville about his public comments at the SAP meeting.  Moreover, there is no evidence that Epps or Sommerville harbored retaliatory animus against plaintiff when they

17

reported their concerns to Derenick-Lopez about his conduct at the SAP meeting.  *Cf. Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 330 (3d Cir. 2015) (applying the "cat's paw" theory of liability in a retaliation case).

In addition, the Court rejects plaintiff's attempts to distinguish his resistance to Derenick-Lopez's requests that he attend sensitivity training from an outright refusal to attend sensitivity training.  Such a distinction is immaterial given the undisputed facts: (1) two City officials testified that plaintiff sometimes spoke "in a very direct fashion," Defs.' SUMF ¶ 65, "[could] be abrasive," *id.* at ¶ 66, and was "definitely not always politically correct," *id.*; (2) several individuals, including two City officials, expressed concerns about his public comments at the SAP meeting and Smart Cities Conference; (3) Derenick-Lopez discussed sensitivity training with plaintiff on two occasions; and (4) plaintiff resisted her instructions to attend sensitivity training and failed to attend such training.  In light of these facts, plaintiff's claim that he never categorically refused to attend sensitivity training fails to demonstrate that defendants' explanation is pretext for an improper retaliatory animus.

Second, plaintiff argues that multiple "contradictions/inconsistencies" in defendants' testimony demonstrate pretext.  Pl.'s Opp'n 23–24.  However, upon review of the record, the Court finds that plaintiff has identified only one inconsistency that arguably relates to defendants' non-retaliatory explanation for his termination.  *See, e.g.*, *Steele v. Pelmor Labs., Inc.*, 725 F. App'x 176, 179 (3d Cir. 2018) (granting summary judgment in favor of employer where "none of the inconsistencies identified by [plaintiff] relate to [the employer's] proffered explanation for her termination").  Plaintiff cites the City's Answers and Objections to Plaintiff's First Set of Interrogatories, in which the City stated that his failure to attend sensitivity training, "set against a background of continued interpersonal conflict with his staff," was the reason for

his termination.  Pl.'s Opp'n Ex. R ¶ 5.  Plaintiff contends that, while he was told his public comments and failure to attend sensitivity training were the reasons for his termination, no City official ever mentioned his "background of continued interpersonal conflict with his staff." However, such a minor discrepancy is insufficient to contradict the "core facts" set forth by defendants as the legitimate reason for plaintiff's termination: that, despite multiple complaints about his public comments, plaintiff resisted instructions from his supervisor to attend sensitivity training.  *Tomasso*, 445 F.3d at 706; *see also Martin v. Allegheny Airlines, Inc.*, 126 F. Supp. 2d 809, 818 (M.D. Pa. 2000) (finding that the "minor inconsistency" between one manager's testimony that he "personally saw no problems with [plaintiff's] attitude" and record evidence that "the decision-makers . . . believed [plaintiff] had interpersonal skills problems" did "not rise to the level to persuade a jury that [the employer's] proffered reason lacks credence").

Third, plaintiff asserts that defendants' "complete and utter failure to investigate" his complaints of race discrimination demonstrates defendants' retaliatory animus.  Pl.'s Opp'n 24. Importantly, plaintiff fails to explain how such a failure would discredit defendants' non-retaliatory explanation for his termination, and he cites no legal authority in support of this argument.  Thus, the Court rejects this argument as a basis for establishing pretext.

Finally, plaintiff argues that the jury could infer that his termination was retaliatory on the ground that the City deviated from internal policies governing discipline and severance agreements for terminated employees.  First, plaintiff contends that the City failed to follow a progressive discipline policy before terminating him.  However, plaintiff has failed to produce evidence of any such City policy.  He instead relies only on the affidavit of White, which states generally that "[i]n [his] experience, the City typically followed a progressive discipline policy, which typically included issuing employees a verbal warning, written warning and/or suspension

prior to termination, when necessary." Pl.'s Opp'n Ex. H ("White Aff.) ¶ 34. However, absent evidence that a progressive discipline policy was "mandatory or rigorously followed, . . . little can be inferred" from the City's failure to follow such a policy. *Emmett*, 528 F. App'x at 262; *see also Smith v. City of Allentown*, 589 F.3d 684, 692 (3d Cir. 2009). Even assuming that such a mandatory policy existed and applied to a senior official such as plaintiff, the record fails to show that the City deviated from this procedure. It is undisputed that Derenick-Lopez verbally alerted plaintiff to concerns about his public comments and the need for sensitivity training on two occasions. *See* Defs.' SUMF ¶¶ 76, 86. Moreover, in the written statement that plaintiff provided to Derenick-Lopez and Slusser upon his termination, he admitted that Derenick-Lopez "made a comment that my job is threatened if I used any statements which anyone might find offensive." Pl.'s Opp'n Ex. QQ at 3. Such evidence belies plaintiff's assertion that he was not warned about his public comments and communication style prior to termination.

The second alleged deviation from City policy involves the City's offer of the severance agreement to plaintiff. Plaintiff argues that the City's severance offer, conditioned on his waiver of potential claims against the City, is evidence of pretext. Although Derenick-Lopez and Mayor Kenney testified that that such severance agreements are not required by City policy, Kenney Written Dep. ¶ 181; Pl.'s CMF ¶ 175, multiple courts have held that a severance offer inconsistent with employer policy does not alone establish pretext. *See Akinlawon v. Overhead Door Corp.*, No. 4:17-CV-00218, 2018 WL 4608488, at *12 (M.D. Pa. Sept. 25, 2018) (rejecting the "argument that an offer of severance, *standing alone*, is sufficient to find pretext"); *see also Baker v. United Def. Indus., Inc.*, 403 F. App'x 751, 757 (3d Cir. 2010); *Arenas v. L'Oreal USA Prod., Inc.*, 790 F. Supp. 2d 230, 238–240 (D.N.J. 2011), *aff'd*, 461 F. App'x 131 (3d Cir. 2012). Significantly, plaintiff has failed to produce evidence related to the severance agreement that

would permit a reasonable factfinder to conclude that defendants' proffered reason for his termination is "unworthy of credence." *Fuentes*, 32 F.3d at 765 (internal citations omitted).

Considered in the context of the several complaints about plaintiff's public comments and Derenick-Lopez's two requests for him to attend sensitivity training, which he rejected, plaintiff has failed to show that defendants' non-retaliatory explanation was "so plainly wrong that it cannot have been the employer's real reason." *Keller*, 130 F.3d at 1109.  Accordingly, plaintiff has failed to meet his burden under the first theory of pretext.

ii.      Second Theory of Pretext

Under the second theory of pretext, a plaintiff may survive summary judgment if he demonstrates that "an invidious [retaliatory] reason was more likely than not . . . a determinative cause of the employer's [adverse] action." *Daniels*, 776 F.3d at 198–99.  The Third Circuit has held that a plaintiff may show pretext under this theory by producing evidence that the employer (1) previously retaliated against him; (2) retaliated against other persons; or (3) treated more favorably similarly situated employees who did not engage in the same protected activity.  *See Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998); *Sawa v. RDG-GCS Joint Ventures III*, No. CV 15-6585, 2017 WL 3033996, at *21 (E.D. Pa. July 14, 2017) (applying the second pretext theory in the retaliation context).  As an initial matter, plaintiff has failed to produce any evidence that the City or individual defendants previously retaliated against him or other persons for opposing the City's allegedly discriminatory hiring practices or complaining that requests to attend sensitivity training were discriminatory.  In fact, plaintiff cites evidence that other City officials complained about feeling improperly pressured by Atkinson to hire minority candidates and yet were not terminated.  *See* Pl.'s CMF ¶ 86; Pl.'s Opp'n 25.  Such evidence undercuts

plaintiff's claim that his opposition to Atkinson and City hiring practices was the but-for cause of his termination.

Under the second theory of pretext, plaintiff argues that other similarly situated senior City officials were treated more favorably than him.  When using proposed comparator evidence to establish pretext in a retaliation case, a plaintiff must show that the other individuals were "similarly situated in all relevant aspects" and engaged in the same conduct as him.  *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011); *Gazarov ex rel. Gazarov v. Diocese of Erie*, 80 F. App'x 202, 206 (3d Cir. 2003).  In this case, plaintiff identifies the conduct of three other senior City officials: Atkinson, Derenick-Lopez, and Abernathy.  Specifically, plaintiff argues that despite his "offensive race-related comments" to City employees about workforce diversity, Atkinson was never directed to attend sensitivity training or disciplined.  Pl.'s Opp'n 25.  Plaintiff also alleges that Derenick-Lopez often used profanities in City meetings but was never disciplined or required to attend sensitivity training.  *Id.*; Pl.'s CMF ¶¶ 181–193.  Finally, plaintiff asserts that Abernathy violated City policy by "improperly contacting [U.S. Immigration and Customs Enforcement (ICE)] to report the release of prisoners" and "berated a colleague of his," yet was not disciplined or required to attend sensitivity training.  Pl.'s Opp'n 25; Pl.'s CMF ¶¶ 181–193.

Although Atkinson, Derenick-Lopez, and Abernathy were all senior City officials, the Court concludes that they were not similarly situated and do not qualify as comparators.  "Comparator analysis normally focuses on an infraction by the plaintiff that led to an adverse employment action and compares that to the infractions and punishments of other employees."  *Henry v. City of Allentown*, No. CIV.A. 12-1380, 2014 WL 4652474, at *2 (E.D. Pa. Sept. 18, 2014).  Thus, the failure to attend sensitivity training—not profanities, "offensive

race-related comments," or improper reporting to ICE—is the operative conduct in this retaliation case.  Significantly, none of the proposed comparators failed to attend sensitivity training after being asked by their supervisor to do so.  *See Johnson v. City of Phila.*, No. CIV.A. 14-1123, 2015 WL 1475277, at *12 (E.D. Pa. Apr. 1, 2015) ("[I]f [two employees'] conduct differed in a way that would be material to an employer, they will not be considered proper comparators.").  Accordingly, Atkinson, Derenick-Lopez, and Abernathy are not appropriate comparators.  The Court therefore concludes that, under the second pretext theory, plaintiff has failed to produce evidence that would permit a reasonable factfinder to infer that retaliation was more likely than not a determinative cause of his termination.

iii.   <u>Conclusion</u>

In sum, viewing the record as a whole in the light most favorable to plaintiff, the Court concludes that plaintiff has failed to rebut defendants' non-retaliatory reason for termination under both theories of pretext.  The Court thus grants defendants' motion for summary judgment on plaintiff's § 1981, Title VII, PHRA, and PFPO claims against all defendants (Counts I, II, V, and VI).

**B.     Retaliation Under the Pennsylvania Whistleblower Law (Count IV)**

The Pennsylvania Whistleblower Law ("PWL") prohibits an "employer"[5] from discharging, discriminating, or retaliating against an employee "because the employee . . . makes a good faith report or is about to report, verbally or in writing, to the employer . . . an instance of wrongdoing or waste."  43 Pa. Cons. Stat. § 1423(a).  In Count IV of the Second Amended

---

[5] The Court notes that the PWL definition of "employer" includes both "public bodies"—such as the City—and individual employees who "receive[] money from a public body to perform work or provide services."  43 Pa. Cons. Stat. § 1422; *see also Brennan v. City of Phila.*, No. CV 18-1417, 2018 WL 4566134, at *7 (E.D. Pa. Sept. 21, 2018) (DuBois, J.).

Complaint, plaintiff asserts that defendants violated the PWL by terminating his employment in retaliation for his complaints about (1) the City's alleged racially discriminatory hiring practices; (2) the body camera bidding process; and (3) the Comcast franchise agreement. *See* Pl.'s Opp'n 37.

Courts apply a burden-shifting framework in evaluating PWL claims. *Golaschevsky v. Com., Dept. of Envtl. Prot.*, 720 A.2d 757, 759–60 (Pa. 1998); *Johnson v. Res. for Human Dev., Inc.*, 789 F. Supp. 2d 595, 601 (E.D. Pa. 2011). To establish a *prima facie* case under the PWL, the plaintiff must first (1) demonstrate he made a "good faith report" of "wrongdoing" or "waste," as those terms are defined in the PWL; and (2) "show by concrete facts or surrounding circumstances that the report [of wrongdoing or waste] led to [the plaintiff's] dismissal." *Golaschevsky*, 720 A.2d at 759 (citing *Gray v. Hafer*, 651 A.2d 221, 225 (Pa. Commw. Ct. 1994) *aff'd,* 669 A.2d 335 (Pa. 1995)). If the plaintiff makes that showing, the burden shifts to the employer to establish "by a preponderance of the evidence that the action by the employer occurred for separate and legitimate reasons, which are not merely pretextual." *O'Rourke v. Dep't of Corr.*, 778 A.2d 1194, 1200 (Pa. 2001) (quoting 43 Pa. Cons. Stat. § 1424(c)).

Assuming *arguendo* that each of the three sets of complaints—the complaints about the City's alleged racially discriminatory hiring practices, the body camera bidding process, and the Comcast franchise agreement—constitutes a "good faith report" under the PWL, the Court concludes that plaintiff has failed to meet his burden of showing a causal connection between those reports and his termination. Under the PWL, evidence of causation includes (1) "specific direction or information . . . not to file the report or that there would be adverse consequences because the report was filed," *Evans v. Thomas Jefferson Univ.*, 81 A.3d 1062, 1070 (Pa. Commw. Ct. 2013) (internal citation and quotation marks omitted); (2) "temporal proximity

between the protected activity and the alleged discrimination," *McAndrew v. Bucks Cty. Bd. of Comm'rs*, 982 F. Supp. 2d 491, 505 (E.D. Pa. 2013) (internal citation and quotation marks omitted); and (3) "the existence of a pattern of antagonism in the intervening period," *id.*  In the absence of that proof, courts may evaluate the record as a whole to determine whether retaliatory animus can be inferred.  *Way v. Aspira Inc.*, No. 17-0579, 2018 WL 1399525, at *4 (E.D. Pa. Mar. 20, 2018).  "'[V]ague and inconclusive circumstantial evidence' is insufficient to satisfy that threshold burden to show a causal connection and shift the burden to the defendant to justify its actions."  *Evans*, 81 A.3d at 1070 (quoting *Golaschevsky*, 720 A.2d at 759–60).

Plaintiff argues that the temporal proximity between his three sets of complaints and termination, coupled with Derenick-Lopez's hostile behavior toward him, establishes causation. The Court rejects this argument.  Under the PWL, "the mere fact that [a] discharge occurred a few months after a report of wrongdoing and that the first formal negative actions by the employer occurred after the report are *not* enough to show a causal connection."  *Evans*, 81 A.3d at 1070–71.  The record shows that plaintiff voiced his concerns about the City's hiring practices in early May of 2017 and confronted senior City officials about the body camera RFP at the meeting on May 11, 2017—approximately eight months before his employment was terminated on January 12, 2018.  Defs.' SUMF ¶¶ 28, 46.  While unclear as to specific dates, plaintiff testified that he spoke to Derenick-Lopez about enforcement of the Comcast franchise agreement multiple times in November and December of 2017, at least one month before his termination. Brennan Dep. 156:1–4, 202:18–203:4.  Such gaps in time alone do not support an inference of causation.  *See Walsh v. Wal-Mart Stores, Inc.*, 200 F. App'x 134, 136 (3d Cir. 2006) (lapse in time of eight months is not "unusually suggestive" of retaliatory animus); *see also Yu v. United*

*States Dep't of Veterans Affairs*, 528 F. App'x 181, 185 (3d Cir. 2013) ("nearly one-month delay" is not "unusually suggestive" of retaliatory animus).

As evidence of an intervening pattern of antagonism, plaintiff cites his own testimony that, following the May 11, 2017 meeting about the body camera RFP, his weekly meetings with Derenick-Lopez became "caustic screaming matches."  Brennan Dep. 177:16 –23.  According to plaintiff, Derenick-Lopez began ignoring his advice about software purchases, "using" plaintiff's staff without notifying him, and making plans for his department without consulting him.  Defs.' SUMF ¶¶ 53–55; Pl.'s CMF ¶¶ 138–144.  Significantly, plaintiff admits that, aside from one argument with Derenick-Lopez, these hostilities ended in early December of 2017— approximately one month before his termination.  Brennan Dep. 196:21–24.  This evidence of temporary tension with Derenick-Lopez, considered in light of the lapse in time between plaintiff's reports and termination, fails to show a pattern of antagonism necessary to establish a causal connection under the PWL.  *See Way*, 2018 WL 1399525, at *5 ("Generally having a contentious relationship with one's boss is the very sort of vague and inconclusive circumstantial evidence that is insufficient to establish causation.").

For the foregoing reasons, the Court concludes that, under the PWL, plaintiff has failed to create a genuine dispute of material fact regarding a causal relationship between his complaints and termination.  The Court thus grants defendants' motion for summary judgment on plaintiff's PWL claim against all defendants (Count IV).

**C.      Retaliation Under the First Amendment (Count III)**

Finally, the Court addresses plaintiff's claim of retaliation under the First Amendment against all defendants.  Plaintiff asserts that defendants violated his First Amendment rights by retaliating against him in response to his complaints regarding (1) the City's alleged racially

discriminatory hiring practices; (2) the body camera bidding process; and (3) the Comcast franchise agreement.  *See* Pl.'s Opp'n 30.

To prevail on a First Amendment retaliation claim against a public employer, a "public employee must show that (1) his speech is protected by the First Amendment and (2) the speech was a substantial or motivating factor in the alleged retaliatory action."  *Dougherty v. Sch. Dist.*, 772 F.3d 979, 986 (3d Cir. 2014).  If the plaintiff proves both elements, the burden shifts to the public employer to show that it would have taken the same employment action even if the speech had not occurred.  *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009).

The Third Circuit has held that a public employee's speech is protected by the First Amendment if (1) the employee speaks in his capacity as a citizen, not as an employee; (2) the speech involves a matter of public concern; and (3) the public employer lacks an "adequate justification for treating the employee differently from any other member of the general public" based on its needs as an employer.  *Flora v. Cty. of Luzerne*, 776 F.3d 169, 175 (3d Cir. 2015) (internal citation and quotation marks omitted); *Dougherty*, 772 F.3d at 987.  Defendants argue that plaintiff's First Amendment claim fails because he was acting as a City employee, not a private citizen, when he made his various complaints about the City's purportedly illegal and wasteful conduct.  The Court agrees with defendants on this issue.

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).  In determining whether a plaintiff speaks pursuant to his official duties in First Amendment retaliation cases, courts in the Third Circuit engage in a "practical inquiry" that considers, *inter alia*, the following factors:

> (1) whether the employee's speech relates to "special knowledge or experience acquired through his job"; (2) whether the employee raises complaints or concerns about issues relating to his job duties "up the chain of command" at his workplace; (3) whether the speech fell within the employee's designated responsibilities; and (4) whether the employee's speech is in furtherance of his designated duties, even if the speech at issue is not part of them.

*Kimmett v. Corbett*, 554 F. App'x 106, 111 (3d Cir. 2014) (internal citations omitted); *see also*

*Bradley v. W. Chester Univ. of Pa. State Sys. of Higher Educ.*, 880 F.3d 643, 651 (3d Cir. 2018)

(collecting Third Circuit cases).

Based on these factors, the Court concludes that plaintiff's complaints were clearly made

pursuant to his official duties as an employee of the City. As CIO, plaintiff was responsible for

hiring decisions in his department and overseeing technology matters for the City, including the

procurement of the police body cameras and enforcement of the Comcast franchise agreement.

*See* Defs.' SUMF ¶¶ 19, 41, 56. With respect to each of the three categories of complaints at

issue—complaints about the City's alleged racially discriminatory hiring practices, the body

camera bidding process, and the Comcast franchise agreement—plaintiff raised his concerns

with either his direct supervisor, Derenick-Lopez, or, in the case of the body cameras, the OIT

Integrity Officer. These statements were made within the course of his "ordinary job

responsibilities," and are therefore unprotected by the First Amendment. *See Bradley*, 880 F.3d

at 653 (holding that the First Amendment did not protect a budget director raising concerns of

fraud at an internal meeting); *Morris v. Phila. Hous. Auth.*, 487 F. App'x 37, 39 (3d Cir. 2012)

(reports up the chain of command about "issues related to an employee's workplace duties,"

including misconduct by co-workers, are "within an employee's official duties"). The Court

therefore grants defendants' motion for summary judgment with respect to plaintiff's First

Amendment claim against all defendants (Count III).

28

V.      **CONCLUSION**

For the foregoing reasons, the Court grants defendants' motion for summary judgment. Judgment is entered in favor of defendants, the City of Philadelphia, Mayor James F. Kenney, Christine Derenick-Lopez, and Jane Slusser, and against plaintiff, Charles Brennan.  An appropriate order follows.